Opinion
 

 GODOY PEREZ, J.
 

 Defendants Alma Lodge, Sheila Dawn Egan doing business as Alma Lodge, and Mamie Russell doing business as Alma Lodge appeal the judgment entered after jury verdicts for plaintiffs Cathryn Kotler, Jim Holt and Beverly Holt. For the reasons set forth below, we affirm the judgment.
 

 Facts and Procedural History
 
 [1]
 

 Alma Lodge, located in the Eagle Rock area of Los Angeles, is licensed by the State of California as a residential facility providing board, care and supervision to mentally ill adults. Alma Lodge is owned by Sheila Dawn Egan, but has been run by its administrator, Mamie Russell, since 1978 when Egan became senile.
 
 [2]
 
 The staff psychiatrist at Alma Lodge was Dr. David Foos.
 

 In August 1994 Rick Mabry (Mabry) and David Holt (Holt) were roommates in unit 14 at Alma Lodge. Holt, age 37, and Mabry, age 26, were both diagnosed as schizophrenics. Unit 14 was one of several second-story units
 
 *1384
 
 located over a garage. The room was not air-conditioned and did not have a fan. On the evening of August 12, 1994, Mabry returned to Alma Lodge after being hospitalized by Foos for more than three weeks because he had stopped eating.
 

 Also in mid-August 1994 the Los Angeles area was gripped by a strong heat wave. According to meteorologist Jay Rosenthal, the temperature in Eagle Rock reached 106 degrees on August 12 and 104 degrees on August 13, the latter being the 6th consecutive day of temperatures near or above 100 degrees. Rosenthal said the heat wave was compounded by high humidity and low winds, which also led to high nighttime temperatures. These factors combined to create category 3 conditions on the heat stress index prepared by the National Oceanic Atmospheric Administration. That is a “danger” category which can lead to sunstrokes, heat cramps, heat exhaustion and heatstroke.
 

 Around 6:20 p.m. on August 13, 1994, another Alma Lodge resident named Tracy entered unit 14. He found Mabry dead in his bed, lying under the covers. Holt was gripping his stomach and moaning. Tracy summoned help, but when paramedics arrived about 10 minutes later, Holt was found dead on a balcony outside the unit.
 

 Holt’s parents, Jim and Beverly Holt, and Mabry’s mother, Cathryn Kotler, sued appellants and Foos for the wrongful deaths of their children.
 
 [3]
 
 Respondents alleged the various antipsychotic medications which Foos prescribed for Holt and Mabry reduced their bodies’ ability to deal with heat and that Foos committed malpractice by failing to ensure that Holt and Mabry took steps to stay cool during the heat wave. As a result, Holt and Mabry died from hyperthermia. Alma Lodge was negligent, respondents alleged, for also failing to protect Mabry and Holt from the effects of their medication during the heat wave. They also contended that Alma Lodge violated certain state regulations which placed an 85-degree limit on room temperatures and which called for proper supervision and observation of its residents. Respondents’ separately filed actions were later consolidated.
 

 Meteorologist Rosenthal testified that the peak outdoor temperature of 104 degrees would have occurred between 2 p.m. and 3 p.m. on August 13, 1994. The peak indoor temperatúre would have lagged behind by three hours. He visited unit 14 and said the roof would have received intense heat while the garage below would have pushed more heat to the living quarters above. At
 
 *1385
 
 its peak, the temperature inside unit 14 would have been at least as high as 104 degrees. At some point, as the evening progressed, the room temperature would be higher than the outdoor temperature.
 

 Daniel Aikin, a deputy coroner investigator for Los Angeles County, arrived at unit 14 sometime after 9 p.m. on August 13, 1994. Using a thermometer, he measured the temperature at 96 degrees inside the room as of 10:05 p.m. and at 88 degrees outside the room as of 10:46 p.m. He recalled the heat as being sweltering. At 10:10 p.m. he measured the temperature of Mabry’s liver as 111 degrees. At 10:46 p.m., he measured Holt’s liver temperature as 105 degrees. Aikin estimated that Mabry died around 4:10 p.m.
 

 Jose Carillo, a detective with the Los Angeles Police Department, arrived at unit 14 around 9:05 p.m. and stayed three or four hours. He, too, recalled the heat inside unit 14 was sweltering and said he was perspiring heavily. His investigation found no signs of suicide or foul play.
 

 Christopher Rogers, M.D., was the Los Angeles County deputy medical examiner who autopsied Mabry and Holt. Rogers testified that Holt and Mabry died from hyperthermia—excessive body heat—due to environmental heat. Rogers had performed five to ten previous autopsies on victims of hyperthermia during Los Angeles heat waves. His opinion was confirmed by the results of a subsequent Chicago heat wave which led to many heat-related deaths. The Chicago coroner set out three criteria which had to be satisfied before hyperthermia could be blamed as the cause of death: The person’s body temperature had to be at least 105 degrees, he had to be in an environment where he could become very hot, and there should be no other plausible cause of death. All three criteria were met in this case, Rogers testified. Hyperthermia does not occur suddenly and requires some time for the body’s temperature to rise. Visible symptoms during this period would include mental confusion, unresponsiveness, lethargy, looking flushed and shortness of breath.
 

 Evidence concerning how often Alma Lodge employees observed Holt and Mabry on the day they died came from three witnesses: Alma Lodge program director Joan Jimenez, Alma Lodge nurse’s aide Bimta Fomenko, and administrator Russell. Jimenez worked from 7:30 a.m. to 1:30 p.m. that day. She testified that she dispensed morning medications to the residents at 8:30 a.m., including Holt, who took breakfast in the air-conditioned dining room. At 9 a.m., after noting that Mabry had not taken his morning medications, Jimenez said she walked to unit 14 to get Mabry. She entered the room, saw Mabry in bed, and told him it was time for breakfast and his
 
 *1386
 
 medications. Mabry replied that he would be right down. Mabry came to the dining room about 9:30 a.m., ate breakfast, then left to sun himself on an outdoor patio.
 

 Jimenez was able to observe Mabry on the patio until he left for his room at 11:30 a.m. Sometime between 11 a.m. and 11:30 a.m., Jimenez asked Mabry how he was doing and Mabry replied “fine.” He returned at noon to sun himself again for another 45 minutes. Jimenez believed the temperature was no higher than the typical summer day, around 80 degrees. Jimenez had worked each of the preceding three days and did not believe there was a heat wave at the time. She last saw Mabry when she went to the dining room around 12:45 p.m. Mabry did not come down for his lunchtime medications, which were handed out between 1 p.m. and 1:30 p.m. When Jimenez went off duty at 1:30 p.m., she was relieved by Fomenko. Jimenez told Fomenko that Mabry had not come down for his lunchtime medications.
 

 Jimenez said Holt left the dining room around 10:30 a.m. and spent the next half hour or so talking with Mabry, who was sunning himself outside. Holt left briefly and returned with a soft drink and spent an undetermined amount of time in the same area as Mabry. She saw Holt again when he came down for his afternoon medications around 1:30 p.m. She never saw Holt again.
 

 According to Jimenez, Alma Lodge had a general practice of watching the residents more during the summer and during her 11 years there, she had been told to have the residents shower and drink water during the summer in order to stay cool.
 

 Fomenko, a nurse’s aide at Alma Lodge, went on duty at 1:30 p.m. on August 13, 1994. A direct care supervisor, she was responsible for observing the residents. While a cook was also on duty, the cook was busy with her job chores and Fomenko was the only employee available to keep tabs on the 60 or so residents. As part of her duties, Fomenko also hands out the residents’ daily medications. Before Jimenez left, she told Fomenko that a few residents had not taken their afternoon medications. Jimenez did not mention Mabry by name, but she knew from the medications which were left out that Mabry was one of those persons. Fomenko placed the medications, which were kept in paper cups, atop a refrigerator near the kitchen.
 

 Fomenko walked over to the building which included unit 14, stood by the garage, and yelled up that Mabry should come down for his medications. A voice which she recognized as Mabry’s replied that he would be right down. Of the several residents Fomenko went to remind about their medications,
 
 *1387
 
 Mabry was the only one she did not actually see. She returned to the dining room to clean the dishes and though she saw the other residents she had just reminded about taking their lunchtime medications, she never saw Mabry take his. Instead, because she later observed that the cup containing his medications was empty, Fomenko assumed Mabry had taken them. She did not see Mabry at lunch and did not know if he ate his lunch.
 

 Between 2 p.m. and 3:30 p.m. Fomenko was setting up medications in the dining room and was unable to observe the residents. At 3:30 p.m. she began doing the residents’ laundry, but in between loading and unloading the washer and dryer, was able to see the residents. She never saw Mabry, however, who did not come down for his 5 p.m. round of medications. By 5:30 p.m., Fomenko realized that Mabry had not taken those medications. She admitted having testified at her deposition that, had it not been for her kitchen duties, she would have gone directly to Mabry’s room at that time. Fomenko said she saw Holt only one time before his death, between 5 p.m. and 5:30 p.m. when he took his evening meal and medications.
 

 Fomenko testified that after 6 p.m. she left the kitchen and went to the office. At 6:20 p.m., an alarm bell hooked up to a unit next to unit 14 went off. Fomenko immediately went toward that building, where she saw Holt face down on the balcony. He did not appear to be breathing. Fomenko ran back to the office and first dialed 911, then called Russell who lived next door.
 

 Asked whether August 13, 1994, had been a very hot day, Fomenko agreed it had been hot, but declined to commit herself to whether it had been very hot, stating “Well, I am a heavy person. I am hot. So I can’t, you know.”
 

 Contrary to the testimony of Jimenez, Russell testified that she entered unit 14 at 8 a.m. on August 13, 1994, to wake up both Holt and Mabry for their morning medications and that she saw Mabry take his medications around 8:30 a.m. At her deposition, however, Russell testified that the first time she saw Mabry that day was at breakfast in the dining room. Russell claimed that Mabry ate breakfast and finished at 9:30 a.m., then went outside to sit in the sun for around 30 minutes. Russell testified that she left the area and next saw Mabry around 1:30 p.m. when he came down for his afternoon medications and lunch. She next saw him around 2 p.m. with Holt and claimed she spoke with both men at that time. That was the last time she saw either Holt or Mabry alive. When she received Fomenko’s phone call about 6:20 p.m., she rushed over to unit 14.
 

 Russell testified at trial that she believed the high temperature on August 13, 1994, was “in the eighties.” She admitted testifying at her deposition that
 
 *1388
 
 it was no hotter than 85 degrees that day because she believed Eagle Rock was cooler than nearby Glendale and Pasadena. Asked at trial how hot it was outside at 6:20 p.m., she said she could not answer. She admitted testifying at her deposition, however, that she believed the temperature was about 70 degrees both outside and inside unit 14 at that time.
 

 Central air-conditioning was installed in the Alma Lodge dining room in 1991 because of the heat on hot days. Air-conditioning was not installed in the residential units, however. Alma Lodge bought fans for some of the rooms, but unit 14 did not have one, Russell testified.
 

 Residential care facilities such as Alma Lodge are licensed and regulated by the state’s Department of Social Services (the Department). (Health & Saf. Code, §§ 1502, subds. (b), (c), 1508, 1509.) The Department’s administrative regulations for these facilities are found at title 22, California Code of Regulations, section 80000 et seq. Under those regulations, Alma Lodge was required to observe each resident for changes in their physical, mental and emotional condition (Cal. Code Regs., tit. 22, § 85075.3, subd. (a)); bring any such observed changes, including deterioration of health condition, to the attention of the resident’s doctor or authorized representative (Cal. Code Regs., tit. 22, § 85075.3, subd. (c)); maintain a comfortable temperature for residents at all times (Cal. Code Regs., tit. 22, § 80088, subd. (a)); and in rooms occupied by residents, maintain a temperature between 68 and 85 degrees, except that in areas of extreme heat, maintain a maximum temperature of 30 degrees below the outdoor maximum temperature. (Cal. Code Regs., tit. 22, § 80088, subd. (a)(1)(A).)
 

 Benjamin Gacad, a licensing program analyst for the Department, testified that Alma Lodge was cited for violations of these sections in connection with the events of August 13, 1994. A citation was issued for violating the maximum temperature regulation, based on the coroner investigator’s thermometer reading of 96 degrees inside unit 14 at 10 p.m. It was not based on the room temperature at any other time, however. A citation was also issued for failing to properly observe Mabry and Holt. The latter citation was based in part on having had only one person to observe sixty residents, Gacad testified.
 
 [4]
 

 As to the various antipsychotic medications prescribed by Poos for Holt and Mabry, there was a great deal of conflicting evidence. Generally, various medical experts testified that the medications might have an anticholergenic
 
 *1389
 
 effect on some patients, which, among others, could inhibit a person’s ability to perspire and therefore keep cool. The same medications might also cause the opposite, known as procholergenic effects, however. While some experts opined that Holt and Mabry’s deaths were partly due to the anticholergenic effects of their medications, Foos and his expert testified otherwise. If their medications had caused an anticholergenic reaction, Holt and Mabry would have had dry mouth, blurred vision, constipation and urine retention. The autopsy showed no signs that either Holt or Mabry had been constipated or retaining urine. Foos testified that he prescribed an anticholergenic drug for Holt and Mabry in order to counteract the procholergenic effect the other drugs were having on them and that the anticholergenic drug had not totally done so. David Paster, M.D., a psychiatric expert called by Foos, testified there was no evidence that either Holt or Mabry had suffered anticholergenic effects and that their medications played no part in their deaths.
 

 The case was called for trial on October 3, 1996. On October 23, 1996, the jury returned its special verdict, finding that Alma Lodge had been negligent, but Foos had not been negligent; that Alma Lodge’s negligence caused the deaths of Holt and Mabry; and that Alma Lodge was 100 percent at fault. The jury awarded $600,000 as damages to the Holts and $600,000 to Kotler. Judgment was entered on the special verdicts the same day.
 

 Appellants later moved for a judgment notwithstanding the verdict (JNOV) on the ground that there was insufficient evidence to support the verdicts. They also moved for a new trial on the following grounds: (1) respondents’ counsel committed misconduct during the closing arguments; (2) the jury committed misconduct in its deliberations; (3) the court erred in permitting the introduction of evidence that Alma Lodge was cited by the Department for various regulatory violations in connection with the deaths of Holt and Mabry; (4) there was insufficient evidence to support the verdicts; (5) the jury awarded excessive damages because it failed to deliberate separately as to each plaintiff and instead agreed in advance to award the same amount to both sets of plaintiffs; and (6) the damages were excessive because Alma Lodge was a health care provider subject to the $250,000 cap on noneconomic damages set forth in Civil Code section 3333.2. Both motions were denied on December 4, 1996.
 

 On December 6, 1996, the court entered an amended judgment, incorporating the parties’ previous stipulation to the amount of funeral expenses incurred by respondents. This timely appeal followed, with appellants raising essentially the same issues asserted in their JNOV and new trial motions.
 

 
 *1390
 
 Discussion
 

 1.-6.
 
 *
 

 7.
 
 Applicability of MICRA
 

 As part of appellants’ new trial motion, they asserted for the first time that the jury’s award of noneconomic damages was subject to the $250,000 cap provided by the Medical Injury Compensation Reform Act (MICRA). (Civ. Code, § 3333.2.)
 

 MICRA’s damages cap applies to actions against health care providers based on professional negligence. (Civ. Code, § 3333.2, subd. (a).) A health care provider for purposes of MICRA is defined as “any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. . . .” (Civ. Code § 3333.2, subd. (c)(1).)
 

 Alma Lodge is licensed as a residential care facility pursuant to Health and Safety Code section 1502, subdivision (a)(1), a part of the Community Care Facilities Act found at chapter 3 of division 2 of the Health and Safety Code (hereafter Division
 
 [9]
 
 Because the statutory authority for its license is found in Division 2 and because Alma Lodge and other such facilities are permitted by department regulations to centrally store and distribute the residents’ medications, assist them with taking their medications, and arrange for and assist with medical and dental care, appellants contend they fall within the ambit of MICRA.
 

 Resolution of this issue requires that we interpret Civil Code section 3333.2, subdivision (c)(1). (2) The fundamental rule of statutory construction is to ascertain the intent of the Legislature in order to effectuate the purpose of the law.
 
 (Decker
 
 v.
 
 City of Imperial Beach
 
 (1989) 209 Cal.App.3d 349, 354 [257 Cal.Rptr. 356].) In doing so, we first look to the words of the statute and try to give effect to the usual, ordinary import of the language, at
 
 *1391
 
 the same time not rendering any language mere surplusage. The words must be construed in context and in light of the nature and obvious purpose of the statute where they appear.
 
 (Ibid.)
 
 The statute “ ‘must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. [Citations.]’ ”
 
 (Id.
 
 at pp. 354-355.) If the language of a statute is clear, we should not add to or alter it to accomplish a purpose which does not appear on the face of the statute or from its legislative history.
 
 (California Teachers Assn.
 
 v.
 
 San Diego Community College Dist.
 
 (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)
 

 Appellants appear to contend that any entity licensed under Division 2 falls within the ambit of MICRA. The express language of the statute, however, states otherwise; A health care provider under MICRA is “any clinic, health dispensary, or health facility, licensed pursuant to Division 2 . . . .” (Civ. Code, § 3333.2, subd. (c)(1).) Thus, the only Division 2 licensees entitled to the protections of MICRA are those licensed as clinics, health dispensaries or health facilities. (Accord,
 
 Coe
 
 v.
 
 Superior Court
 
 (1990) 220 Cal.App.3d 48, 53 [269 Cal.Rptr. 368] (hereafter
 
 Coe)
 
 [holding that while a blood bank licensed pursuant to chapter 4 of Division 2 (§ 1600 et seq.) qualified as neither a clinic nor a health facility as defined in Division 2, it was a health dispensary under MICRA].)
 

 Not only would a contrary holding render surplusage the Legislature’s use of the terms “clinic,” “health dispensary” and “health facility” to specify which Division 2 licensees are covered by MICRA, this limitation also makes sense in light of MICRA’s purpose, which was to remedy a health care crisis attributed to the high cost of malpractice insurance.
 
 (Coe, supra, 220
 
 Cal.App.3d at p. 53.) For example, while Division 2 governs the licensing of entities such as clinics, health facilities and skilled nursing care facilities, it also includes day-care centers (§ 1596.70 et seq.) and family day-care homes. (§ 1597.30 et seq.) By no stretch of law or linguistics could day-care facilities be considered health care providers and an interpretation which included such facilities within the protections of MICRA would produce an absurd result.
 

 We next examine whether Alma Lodge was either a clinic, health facility or health dispensary under Division 2. Section 1200 defines a clinic as “an organized outpatient health facility which provides direct medical, surgical, dental, optometric, or podiatric advice, services, or treatment to patients who remain less than 24 hours . . . .” Appellants conceded at oral argument that Alma Lodge was not a clinic.
 

 
 *1392
 
 A health facility means “any facility, place, or building which is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation ... to which the persons are admitted for a 24-hour stay or longer . . . .” (§ 1250.) This includes general acute care hospitals, acute psychiatric hospitals, skilled nursing facilities, intermediate care facilities, special hospitals, congregate living health facilities of no more than six beds which provide twenty-four-hour skilled nursing care and medical supervision, and correctional treatment facilities. (§ 1250, subds. (a)-(k).)
 
 [10]
 

 Appellants contended for the first time during oral argument that they qualified as a health facility under section 1250. Because the argument was not included in their appellate briefs and because they have failed to point us
 
 *1393
 
 to any specific provision of section 1250 which applies to residential care facilities licensed under section 1502, we deem the issue waived.
 
 (Landry
 
 v.
 
 Berryessa Union School Dist.
 
 (1995) 39 Cal.App.4th 691, 699-700 [46 Cal.Rptr.2d 119];
 
 Unilogic, Inc.
 
 v.
 
 Burroughs Corp.
 
 (1992) 10 Cal.App.4th 612, 624 [12 Cal.Rptr.2d 741].) We alternatively conclude that Alma Lodge was not a health facility.
 

 The statutory provisions which govern residential care facilities such as Alma Lodge go to great lengths to separate those facilities from others which provide medical and health-related care. Section 1501 sets forth the legislative intent and declaration behind the Community Care Facilities Act. Among its purposes is to “insure continuity of care between the medical-health elements and the supportive care-rehabilitation elements of California’s health systems . . . .” (§ 1501, subd. (b)(4).) Residential facilities such as Alma Lodge are statutorily defined as providing
 
 “nonmedical care
 
 of persons in need of personal services, supervision, or assistance essential for sustaining the activities of daily living or for the protection of the individual.” (§ 1502, subd. (a)(1), italics added.) Nothing in this language compares with the medical, dental, psychological, nursing and other such services rendered by the various entities defined as health facilities by section 1250, subdivisions (a) through (k). (See
 
 ante,
 
 fn. 10.)
 

 Appellants’ reliance on the limited class of health-related services which they are permitted to provide as proof that Alma Lodge falls within the ambit of MICRA is misplaced. The Department’s regulations set forth certain health-related services which residential facilities may provide. These include observing the residents for changes in their physical or mental conditions, and assistance with bathing and personal needs or with obtaining a doctor. The regulations also permit facilities such as Alma Lodge to ensure that residents are assisted as needed with the self-administration of medications, but they may not administer injections. (Cal. Code Regs., tit. 22, § 80075, subd. (a)(2)(A).) Residents’ medications are to be centrally stored in a safe, locked place if they must be refrigerated or if the facility administrator or the resident’s physician determines they would be dangerous for the resident to possess.
 
 (Id.,
 
 at subd. (Z)(l)-(3).)
 

 While residential care facilities may provide incidental medical services, if such services constitute a substantial component of the total services provided, the facility must also become licensed as either a clinic under section 1200 or a health facility under section 1250. (§ 1507.) These permitted incidental medical services include changing or emptying colostomy and urinary catheter bags, or feeding, hydrating and adding prescribed medication to persons with gastrostomies. (§ 1507, subd. (b)(l)-(3).) At the same
 
 *1394
 
 time, health clinics and health facilities are exempt from the licensing requirements imposed on residential care facilities such as Alma Lodge. (§ 1505, subds. (a), (b).)
 

 Statutory sections relating to the same subject must be read together and harmonized.
 
 (Industrial Risk Insurers
 
 v.
 
 Rust Engineering Co.
 
 (1991) 232 Cal.App.3d 1038, 1042 [283 Cal.Rptr. 873].) Sections 1505 and 1507, when read together, suggest to us that a residential care facility is not the same as a health facility merely because it provides certain incidental, health-related services. If health facilities under section 1250 are exempt from the statutes which govern residential care facilities, and if a residential care facility need not be licensed as a health facility when providing incidental medical services, but a residential care facility which provides more than incidental medical services must become licensed as a health facility, the only logical conclusion which can be drawn is that a residential care facility which provides only incidental medical services is
 
 not
 
 a health facility.
 

 Accordingly, we hold that residential facilities licensed pursuant to section 1502, subdivision (a)(1) are not licensed health facilities in Division 2 and are therefore outside the reach of MICRA.
 

 Since Alma Lodge was neither a clinic under section 1200 nor a health facility under section 1250, if it is to qualify for the damage ceiling supplied by MICRA, it must do so as a health dispensary licensed under Division 2. It does not.
 

 The term “health dispensary” is not defined by either the Health and Safety Code or MICRA. The only reported decision to consider its meaning was
 
 Coe, supra,
 
 220 Cal.App.3d 48, which held that while a blood bank licensed pursuant to chapter 4 of Division 2 (§ 1600 et seq.) qualified as neither a clinic nor a health facility as defined in Division 2, it was a health dispensary. In so holding, the
 
 Coe
 
 court relied on rules of statutory construction to conclude that the Legislature intended the term “health dispensary” in MICRA to mean something separate and apart from clinics and health facilities and that health dispensaries were an additional and separate category of Division 2 licensees covered by MICRA.
 
 (Id.
 
 at p. 53.) Noting that blood banks were defined within Division 2 as any place where human blood is collected, prepared, tested and stored, or from which human blood is distributed
 
 (id.
 
 at p. 53, fn. 4), the court held that blood banks were health dispensaries because they “dispensen a product and provide[] a service inextricably identified with the health of humans.”
 
 (Id.
 
 at p. 53.)
 

 With these various provisions in mind, we hold that Alma Lodge was not a health dispensary for purposes of MICRA. Unlike the blood bank in
 
 Coe,
 
 
 *1395
 

 supra,
 
 220 Cal.App.3d 48, facilities such as Alma Lodge are not licensed to distribute health products inextricably identified with human health. Instead, they are expressly defined as nonmedical board and care facilities which provide a supervised and structured place to live for persons in need of such assistance. Helping those residents take medications which a physician has prescribed, storing those medications for safekeeping, making sure that residents get medical help if needed, and arranging for transportation in connection with that care, do not make such facilities health dispensaries. Since MICRA does not apply to Alma Lodge, the trial court did not err in refusing to reduce the jury’s verdict according to MICRA’s terms.
 

 Disposition
 

 For the reasons set forth above, the judgment is affirmed. Respondents .Tim Holt, Beverly Holt and Cathryn Kotler to recover their costs on appeal.
 

 Turner, P. J., and Armstrong, L, concurred.
 

 A petition for a rehearing was denied June 15, 1998, and appellants’ petition for review by the Supreme Court was denied August 26, 1998.
 

 [1]
 

 Because resolution of (Ms matter turns primarily upon the existence of substantial evidence to support the judgment, we state the facts in the manner most favorable to respondents, resolving all evidentiary conflicts in their favor.
 
 (Aceves
 
 v.
 
 Regal Pale Brewing Co.
 
 (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619], overruled on other grounds by
 
 Privette
 
 v.
 
 Superior Court
 
 (1993) 5 Cal.4th 689, 696 [21 Cal.Rptr.2d 72, 854 P.2d 721].) Where necessary, we also state those facts which respondents rely upon as grounds for reversal.
 

 [2]
 

 Alma Lodge, Russell and Egan will sometimes be referred to collectively as “appellants.”
 

 [3]
 

 Plaintiffs and respondents Jim and Beverly Holt will sometimes be referred to collectively as “the Holts.” Plaintiff and respondent Kotler and the Holts will sometimes be referred to collectively as “respondents.”
 

 [4]
 

 Alma Lodge was also cited for leaving residents’ medications on top of a refrigerator, instead of under lock and key.
 

 *
 

 See footnote,
 
 ante,
 
 page 1381.
 

 [9]
 

 A11 further statutory references are to the Health and Safety Code unless otherwise indicated.
 

 [10]
 

 A general acute care hospital “means a health facility having a duly constituted governing body with overall administrative and professional responsibility and an organized medical staff that provides 24-hour inpatient care . . . .” (§ 1250, subd. (a).) An acute psychiatric hospital “means a health facility having a duly constituted governing body with overall administrative and professional responsibility and an organized medical staff that provides 24-hour inpatient care” for the mentally ill. (§ 1250, subd. (b).) A skilled nursing facility “means a health facility that provides skilled nursing care and supportive care to patients” who need such care on an extended basis. (§ 1250, subd. (c).) An intermediate care facility “means a health facility that provides inpatient care to ambulatory or nonambulatory patients who have recurring need for skilled nursing supervision,” but who do not need such care continuously. (§ 1250, subd. (d).) An intermediate care facility/developmentally disabled habilitative “means a facility with a capacity of 4 to 15 beds that provides 24-hour personal care, habilitation, developmental, and supportive health services to 15 or fewer developmentally disabled persons” who need nursing services on a recurring, intermittent basis. (§ 1250, subd. (e).) A special hospital “means a health facility having a duly constituted governing body with overall administrative and professional responsibility and an organized medical or dental staff that provides inpatient or outpatient care in dentistry or maternity.” (§ 1250, subd. (f).) Intermediate care facility/developmentally disabled “means a facility that provides 24-hour personal care, habilitation, developmental, and supportive health services to developmentally disabled clients whose primary need is for developmental services and who have a recurring but intermittent need for skilled nursing services.” (§ 1250, subd. (g).) Intermediate care facility/developmentally disabled—nursing “means a facility with a capacity of 4 to 15 beds that provides 24-hour personal care, developmental services, and nursing supervision for developmentally disabled persons who have intermittent recurring needs for skilled nursing care .... The facility shall serve medically fragile persons who have developmental disabilities or demonstrate significant developmental delay . . . .” (§ 1250, subd. (h).) Congregate living health facility “means a residential home with a capacity . . . of no more than six beds, that provides inpatient care, including the following basic services: medical supervision, 24-hour skilled nursing and supportive care, pharmacy, dietary, [and] social recreational.... This care is generally less intense than that provided in general acute care hospitals but more intense than that provided in skilled nursing facilities.” (§ 1250, subd. (i).) Correctional treatment center “means a health facility operated by the Department of Corrections . . . that. . . provides inpatient health services to that portion of the inmate population who do not require a general acute care level of basic services.” (§ 1250, subd. (j).) Nursing facility “means a facility that is certified to participate as a provider of care in the federal medicaid program” and is licensed as a skilled nursing facility or an intermediate care facility. (§ 1250, subd. (k).)