[No. B137258. Second Dist., Div. Three. July 20, 2001.]

JILL KLAJIC et al., Plaintiffs and Appellants, v.
CASTAIC LAKE WATER AGENCY, Defendant and Respondent.

COUNSEL

Jennifer Kilpatrick for Plaintiffs and Appellants.

Robert H. Clark; Kane, Ballmer & Berkman, and R. Bruce Tepper, Jr., for Defendant and Respondent.

OPINION

ALDRICH, J.—

### INTRODUCTION

Petitioners,[1] water users in the Santa Clarita Valley area, appeal from the judgment of the trial court denying their petition for writ of mandate. Petitioners sought to compel respondent Castaic Lake Water Agency (the Agency) to divest itself of its ownership of all of the stock of respondent Santa Clarita Water Company (the Water Company), and to comply with its own enabling statute, which limits the Agency to the wholesale distribution of water.

At issue in this appeal is the interpretation and application of Water Code[2] section 12944.7. That section allows a wholesale water agency to sell water at retail "only pursuant to written contract with . . . a water corporation . . . subject to regulation by the Public Utilities Commission. . . ." The Agency contends that the retail sales contract it executed in connection with its purchase of the Water Company complies with section 12944.7. Petitioners contend, as the result of the Agency's purchase of the Water Company, that the latter has become the alter ego of the Agency. Thus, they argue, the contract does not satisfy the requirements of the statute and so the Agency remains limited to selling water at wholesale.

We hold, as a matter of law, that the contract contemplated in section 12944.7 is one between the Agency and a separate entity, for the Agency's use of that entity's facilities. We further conclude that the entity must remain both separate and subject to regulation by the Public Utilities Commission during the life of the contract. In denying the writ petition here, the trial court failed to determine whether, at the close of the stock purchase transaction, the Water Company remained separate from the Agency so that the section 12944.7 contract could endure. Accordingly, we reverse the judgment.

---

[1]Petitioners are Jill Klajic, Lynn Plambeck, Joan Dunn, and Jackie Bettencourt.

[2]Hereinafter, all statutory references shall be to the Water Code, unless otherwise stated.

## Factual and Procedural Background

### 1. *The parties.*

The Agency was created by the Legislature in the Castaic Lake Water Agency Law. (72A West's Ann. Wat.—Appen. (1999 ed.) § 103-1 et seq., p. 487 et seq., hereinafter the Agency Act.) Section 103-15 of the Agency Act describes the Agency's purpose: to "acquire water and water rights . . . and provide, sell, and deliver that water *at wholesale only* . . . through a transmission system to be acquired or constructed by the agency." (Agency Act, § 103-15, p. 500, italics added.) Operating in the Santa Clarita Valley area of Los Angeles County (*id.*, § 103-2, pp. 487-490), the Agency provides water to four local water utilities, the largest of which was the Water Company.

Until the transaction here at issue, the Water Company was a for-profit California corporation and a public utility subject to regulation by the Public Utilities Commission (the PUC). As a water "purveyor,"[3] its purpose was to distribute and sell water to its 21,000 domestic, industrial, and commercial accounts within the Agency's boundaries. In addition to its purchases of water from the Agency, the Water Company owned 15 water wells and had access to two freshwater aquifers in the eastern groundwater basin of the Santa Clara River with the ability to extract 15,000 acre/feet of water yearly.

Petitioners are property owners, residents, and taxpayers in the area covered by the Agency who claim to be beneficially interested in the issuance of a writ because, if the Agency suffers adverse financial consequences from its purchase of the Water Company, petitioners' water rates will increase; and if water must be rationed, they will suffer greater adverse consequences than they would if the Water Company remained a separate purveyor.

### 2. *The challenged transaction.*

The challenged transaction between the Agency and the Water Company involved two inextricably connected parts. In the contract portion, the Water Company and Agency executed an agreement to permit the Agency to sell

---

[3]Section 103-4.8, page 492 of the Agency Act defines "purveyor" as "a retail water distributor which has facilities connected to the agency's water transmission system on April 15, 1986, or is under contract with the agency for water on that date."

water directly to consumers (hereinafter the Retail Service Agreement). In the condemnation proceeding, the Agency *concurrently* took by eminent domain all of the outstanding stock of the Water Company in order to give the Agency complete control of the Water Company.

Specifically, on August 11, 1999, the Agency approved the Retail Service Agreement. That agreement recites that it was made on August 31, 1999, and that "[a]s *a part of* a possible settlement of the Agency Condemnation Action, [the Water Company] agreed to contract with the Agency to grant to the Agency *the right to sell water directly to consumers* within the area in which [the Water Company] operates." (Italics added.) The Retail Service Agreement further recites that "The Agency and [Water Company] intend that this grant to the Agency shall satisfy the requirements of Section 12944.7 . . . and [shall] be liberally construed to effect the purposes of Section 12944.7. . . ."

*Simultaneously*, the Agency's directors passed Resolution No. 2065 to effectuate the condemnation portion of the transaction. Resolution No. 2065 authorized the condemnation of all of the issued and outstanding capital stock of the Water Company. (Agency Act, § 103-15, subd. (g), p. 501.) The resolution declared that public interest and necessity require the acquisition of the Water Company's capital stock "to advance the business and statutory purposes of the Agency, including, but not limited to, providing, delivering and selling wholesale water within the Agency's jurisdiction as well as *providing retail service pursuant to Water Code section 12944.7 . . . ."* (Italics added.)

The Agency planned to finance this two-part transaction by issuing up to $70 million in retail system revenue certificates of participation through an installment purchase agreement with its own financing corporation.

On August 12, 1999, the Agency filed its complaint to condemn and acquire all of the issued and outstanding capital stock of the Water Company.[4] (*Castaic Lake Water Agency v. Santa Clarita Water Co.* (Super. Ct. L.A. County, No. BC215065).)

---

[4]On August 25, 1999, petitioners filed a notice of related cases in the condemnation proceeding, notifying the court of the pending petition for writ of mandate and the complaint for injunctive and declaratory relief. On September 14, 1999, 12 days after judgment was entered in the condemnation action, the trial court entered an order finding that the condemnation action was not related to the mandamus actions under the Superior Court of Los Angeles County, Local Rules, rule 7.3.

3. *The writ petition.*

On August 23, 1999, after the above resolutions were passed and the Retail Service Agreement was signed, but before the final judgment was issued in the condemnation action and before the transaction was closed, petitioners filed their petition "for peremptory writ of mandate or prohibition." (Code Civ. Proc., §§ 1085, 1086, 1102, 1103.) The amended petition[5] alleged that the Agency's condemnation of the Water Company stock and retail sale of water violates the Agency Act. (Agency Act, § 103-15, pp. 500-504.) Petitioners also challenged as ultra vires the terms and conditions of the financing arrangement. Petitioners requested that the trial court issue a writ of mandate or prohibition to require the Agency and the Water Company to cease violating the language of the Agency Act, which limits the Agency to selling water "at wholesale only," and to cease its attempt to acquire the Water Company.[6]

4. *The challenged transaction closes.*

A week after the petition was filed, on September 1, 1999, the Agency executed a new stock purchase agreement to purchase the Water Company's stock for $63 million *in cash,* averting the financing arrangement challenged in the petition.

The next day, on September 2, 1999, a stipulation for judgment for $63 million was entered in the eminent domain action. The judgment stated that the Agency was authorized by the provisions of section 12944.7 to enter, and did enter, into written contracts with retail water purveyors to sell water to any ultimate water consumer within the Agency's jurisdiction. The judgment also recited that the Agency was empowered by article 16, section 17 of the California Constitution to acquire shares of a water company for the purpose of furnishing water for public purposes.

On September 3, 1999, the consideration of $63 million *in cash* was transmitted to the shareholders of the Water Company, the Retail Service Agreement was delivered, and the court executed a final order condemning in favor of the Agency all rights, title, and interest in the Water Company's outstanding shares.

---

[5]The petition was amended on September 1, 1999.

[6]Concurrently, petitioners filed a complaint for declaratory and injunctive relief seeking a declaration that the structure of the financing scheme for the Agency's acquisition of the Water Company's stock violated sections 103-15 and 103-28, pages 500-504, 516-517, of the Agency Act. Petitioners dismissed the declaratory relief action on October 18, 1999.

Thereafter, in connection with the stock purchase, the Water Company issued a number of resolutions designed to wind up the Water Company's business, dissolve the corporation, distribute its remaining assets to the Agency, and accept the resignation of three of the Water Company's directors and its secretary.[7]

## 5. *The ruling on the petition.*

At the hearing, originally scheduled to consider petitioners' motion for a stay of the transaction, petitioners cited the legislative history of section 12944.7 to argue that the effect of the transaction was to merge the Water Company with the Agency so that the two organizations would "be[] operated as a unified entity," one becoming the alter ego of the other. Additionally, petitioners argued, whatever company existed after the merger would no longer be regulated by the PUC. The net result of the transaction, petitioners claimed, is that the Retail Service Agreement does not comply with section 12944.7, and the Agency may not sell water at retail.

In its defense, the Agency argued that the language of the statute is clear, precluding resort to its legislative history, and that the Retail Service Agreement is a contract that complies with the letter of section 12944.7. The Agency never addressed the effect of the transaction on the Water Company, i.e., after the transaction closed, what form the Water Company took and whether the Water Company even continues to exist as an ongoing concern, separate from the Agency. Although the Agency asserted that "[t]he water company *is* subject to PUC regulations" (italics added), it flatly disagreed that section 12944.7 requires the Water Company to *remain subject to PUC control* during the life of the contract in order for the Retail Service Agreement to comply with the statute. Counsel for the Agency argued, "You don't see any continuing obligation to be regulated by the PUC in 12944.7. . . ."

The court admitted into evidence the legislative history of section 12944.7, and ruled "it does appear . . . that 12944.7 is sufficiently clear and is applicable here, and it does override Section [103-]15" of the Agency Act limiting the Agency to wholesale water distribution. (Agency Act, § 103-15, pp. 500-504.) The court denied the writ petition and petitioners' appeal ensued.

---

[7]The record does not contain executed versions of these resolutions.

Discussion

1. *Writ of mandamus and standard of review.*

 ██ ██ ██ A traditional writ of mandate under Code of Civil Procedure section 1085[8] is a method for compelling a public entity to perform a legal and usually ministerial duty. (*Kreeft v. City of Oakland* (1998) 68 Cal.App.4th 46, 53 [80 Cal.Rptr.2d 137].) The trial court reviews an administrative action pursuant to Code of Civil Procedure section 1085 to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, or whether the agency failed to follow the procedure and give the notices the law requires. (*Kreeft, supra,* at p. 53; *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892].) "Although mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it will lie to correct abuses of discretion. [Citation.] In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.]" (*Helena F. v. West Contra Costa Unified School Dist.* (1996) 49 Cal.App.4th 1793, 1799 [57 Cal.Rptr.2d 605].)

 "In reviewing a trial court's judgment on a petition for writ of ordinary mandate, we apply the substantial evidence test to the trial court's

---

[8]Code of Civil Procedure section 1085 states in pertinent part, "A writ of mandate may be issued by any court, except a municipal court, to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station. . . ."

The Agency contends that the petition should have been denied on the procedural ground that petitioners' attack on the transaction could have been brought as a validation action under Code of Civil Procedure section 860 et seq. Hence, the Agency argues, where petitioners had a remedy at law, the mandamus action could not lie. The Agency is wrong.

Section 103-19, page 507, of the Agency Act states, "An action to determine the validity of any bonds, warrants, promissory notes, contracts, or other evidences of indebtedness of the kinds authorized by subdivision . . . (*o*) . . . of Section 15, may be brought pursuant to [Code of Civil Procedure section 860]." This section allows for a validation action whenever a challenge is made to the validity of financing. The action is to determine the validity of "bonds, warrants, . . . *contracts, or other evidences of indebtedness.*" (Agency Act, § 103-19, p. 507, italics added.) Because all of the items enumerated in section 103-19 refer to forms of financing, under the principle of *ejusdem generis,* "contracts" in this context necessarily refers to contracts for financing. (*Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 331, fn. 10 [158 Cal.Rptr. 370, 599 P.2d 676].) Once the Agency restructured the transaction here to be an all-cash deal, the petition no longer attacked the financing scheme, and a validation action concerning financing no longer provided petitioners with an adequate remedy at law by which to challenge the Agency's statutory authority to sell water at retail. Therefore, the petition for writ of mandate/prohibition was properly brought.

factual findings." (*Kreeft v. City of Oakland, supra,* 68 Cal.App.4th at p. 53.) Thus, foundational matters of fact are conclusive on appeal if supported by substantial evidence. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169-1170 [56 Cal.Rptr.2d 223].) However, we exercise our independent judgment about legal questions. (*Kreeft, supra,* at p. 53; *Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].) With these rules in mind, we turn to the question of the meaning of section 12944.7.

2. *Section 12944.7 contemplates the Agency will contract with an entity that will remain separate from the Agency for the duration of the contract period.*

Section 12944.7 states in relevant part: "Notwithstanding any other provisions of law, any public agency which has executed a contract with the state for a water supply . . . may sell any water available to that agency directly to any ultimate water consumer within the agency. If the principal act of the public agency restricts the agency to the wholesale distribution of water, the right to sell water directly to consumers may be exercised by the agency *only pursuant to written contract with . . . a water corporation,* if any exists, *subject to regulation by the Public Utilities Commission* and serving water at retail within the area in which the consumer is located." (Italics added.)

Here, the Agency Act restricts the Agency to the wholesale distribution of water. (Agency Act, § 103-15, pp. 600-504.) Therefore, to sell water at retail, the Agency must comply with the second sentence of section 12944.7. At issue is the meaning of the word "contract" in that second sentence. This is a legal question over which we exercise our independent judgment. (*Kreeft v. City of Oakland, supra,* 68 Cal.App.4th at p. 53.)

Petitioners contend that the contract contemplated by the Legislature in section 12944.7 is similar to a lease for use of the retail purveyor's facilities to sell water directly to retail consumers. Based on the challenged transaction here, under which the Agency took the Water Company by eminent domain, petitioners argue that the Retail Service Agreement does not satisfy the statute's contract requirement. By contrast, the Agency takes the position that it complied with every condition of section 12944.7. The Agency asserts it (1) had a contract—the Retail Service Agreement—(2) with a water company (3) that was subject to PUC regulation at the time the Retail Service Agreement was entered into. The Agency, however, omits to discuss the nature of the entire challenged transaction. That is, the Agency offered no analysis about whether the transaction is actually a merger or, as a result

of the deal, whether the Water Company has become the alter ego of the Agency, and what effect that transformation might have on the Retail Service Agreement.

 a. *The rules of statutory interpretation.*

 In determining the nature of the contract required by section 12944.7, we apply the usual rules of statutory interpretation. ▉ "The fundamental rule of statutory construction is to ascertain the intent of the Legislature in order to effectuate the purpose of the law. . . . In doing so, we first look to the words of the statute and try to give effect to the usual, ordinary import of the language, at the same time not rendering any language mere surplusage. The words must be construed in context and in light of the nature and obvious purpose of the statute where they appear. . . . The statute ' "must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. . . ." ' " (*Kotler v. Alma Lodge* (1998) 63 Cal.App.4th 1381, 1390-1391 [74 Cal.Rptr.2d 721], citations omitted.) ▉ " '[The] language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' [Citations.]" (*People v. Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420].) "If the language of a statute is clear, we should not add to or alter it to accomplish a purpose which does not appear on the face of the statute or from its legislative history. . . ." (*Kotler v. Alma Lodge, supra,* at p. 1391, citations omitted.) "Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.]" (*People v. Pieters, supra,* at p. 899.)

 b. *Section 12944.7 plainly contemplates an arm's-length contract for use.*

 ▉ The language of the statute is clear on its face. Section 12944.7 grants the agency the right to sell water at retail *"only pursuant to written contract with"* another entity. (§ 12944.7, italics added.) It is so elementary that it hardly need be stated that " '[t]here must be at least two parties to a contract. . . .' " (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 7, p. 44; Civ. Code, §§ 1550, 1556.) An interpretation which allows the Agency here to enter into a contract with itself would render the contract a nullity (*Luis v. Orcutt Town Water Co.* (1962) 204 Cal.App.2d 433, 444 [22 Cal.Rptr. 389]), defeat the plain meaning of the word "with," and would be neither a reasonable nor a commonsense interpretation of the requirement that the Agency have a contract to sell water at retail.

It is further manifest that the two parties to the contract must maintain their separate existences during the life of the contract, or at any time that the agency seeks to sell water at retail. Otherwise, the italicized language that the right to sell at retail is made *"only pursuant to* written contract *with"* would be rendered superfluous. Stated differently, the Legislature could have granted the wholesaler Agency the absolute right to sell water at retail without requiring a contract, and so its inclusion of the second sentence in section 12944.7 clearly manifests the Legislature's intent there be a contract, which a fortiori, must be between two separate parties, each time the Agency sells water at retail.

Therefore, to comply with section 12944.7, *whenever* a wholesaler agency sells water directly to the consumer, it must be doing so pursuant to a *contract* with a water company that exists as an entity, be it a wholly owned subsidiary or otherwise, independent from the wholesaler agency.

For these same reasons, we also conclude that a water company, with whom the wholesaler-agency contracts, must remain subject to PUC regulation throughout the life of the contract. The Agency argued that there is no "continuing obligation to be regulated by the PUC" once the transaction is closed. We reject this "nanosecond" argument because it renders section 12944.7's requirement of PUC regulation pointless and surplusage. (*Kotler v. Alma Lodge, supra,* 63 Cal.App.4th at pp. 1390, 1391.)

Our interpretation of the statute comports with the legislative history of Assembly Bill No. 2827,[9] which became section 12944.7. As explained by a proponent, the Department of Water Resources, in its enrolled bill report, "[b]efore the wholesale agency could make retail sales in its service area, *it would need to make a contract allowing the retail sales with the public or private entity that would normally make the retail sales."* (Dept. of Water Resources, Enrolled Bill Rep. on Assem. Bill No. 2827, *supra,* at p. 1, italics added.) Continuing, the enrolled bill report summary states, "[t]o protect the current retailers, the bill would require [the Agency] to make a contract with the retailer *before making the retail sales. In negotiating the contracts, the respective agencies would be able to work out their various interests."* (Dept. of Water Resources, Enrolled Bill Rep. on Assem. Bill No. 2827, *supra,* at p. 3, italics added.)

Indeed the record indicates the Department of Water Resources put Assembly Bill No. 2827 forward expecting that it "would authorize State Water

---

[9]The Agency sponsored section 12944.7 through Senator Kelley in response to then recent changes to the federal tax law to allow the Internal Revenue Service to tax the municipal bonds of a water wholesaler who sold at retail. (Dept. of Water Resources, Enrolled Bill Rep. on Assem. Bill No. 2827 (1989-1900 Reg. Sess.) Aug. 28, 1990, signed by David Kennedy, Dept. Head, p. 2.)

Project contractors which are wholesale agencies to provide retail service <u>by contract</u> with the entities which are empowered to sell water at retail. *Such retail entities could 'rent' distribution capacity to a State Water Contractor, and would bill the consumer much in the same fashion as your local telephone company bills for the benefit of both itself and the long-distance carriers with which its customers also have a contractual relationship.* [¶] Current retail water purveyors ought not to oppose this bill, inasmuch as it can be implemented *only pursuant to contract.*" (Proposed Legislation to Preserve Historical Tax-Exempt Financing Option of State Water Contractor Agencies, attached to letter to Steven Macola, Consultant to the Senate Agriculture and Water Resources Committee, from David N. Kennedy, Director, Department of Water Resources, dated June 28, 1990, underline in original, italics added.)

We hold that in enacting section 12944.7, the Legislature contemplated a contract, entered into after arm's-length negotiations, granting the Agency the permission to *use*—as opposed to take over and own—the Water Company's facilities. The Water Company could, for example, be a wholly owned subsidiary of, or wholly separate from, the Agency; but whatever form it takes, it must be distinct from the Agency and remain subject to PUC regulation to comply with the statute.

Turning to the judgment here under review, the trial court correctly concluded as a matter of law that section 12944.7 "override[s]" the portion of section 103-15, pages 500-504 of the Agency Act that limits the Agency to wholesale distribution of water. That is the purpose behind the statute. The ruling that section 12944.7 *can* authorize the Agency to sell water at retail, however, only addresses half of the question raised by the writ petition. Omitted from the judgment below is whether, as the result of the challenged transaction, the Water Company continues to exist as an entity sufficiently separate from the Agency and continues to be subject to PUC regulation in order to enable the contract to endure.

3. *The case must be remanded.*

Petitioners argued at length before the trial court that, as the result of the challenged transaction, the Water Company was dissolved, the two companies merged, and the Water Company became the Agency's alter ego, with the result that the contract could not satisfy section 12944.7. The Agency responds by suggesting that the condemnation portion of the challenged transaction, by which it acquired all of the Water Company's stock, is legal but irrelevant, and that the Retail Service Agreement, standing alone, satisfies the contract requirement of section 12944.7.

We do not disagree with the Agency that it was lawfully empowered to acquire the Water Company (Cal. Const., art. XVI, § 17) and that it has the authority to exercise the right of eminent domain to take property for any facility reasonably required for the importation and transmission of water. (Agency Act, § 103-15, subds. (e) & (g), p. 501.) However, we reject the Agency's argument that the challenged transaction can be separated into discrete, unrelated parts and still comply with section 12944.7.

A case in point is *Luis v. Orcutt Town Water Co., supra*, 204 Cal.App.2d 433. To recover his losses after his store was destroyed by fire, the plaintiff sued the Orcutt Town Water Company, which supplied water to the town, and Union Oil Company, a private water company, which also supplied water to the town. The complaint alleged that contracts between the defendants obligated them to provide water in case of emergencies. (*Id.* at pp. 436-437.) The complaint further alleged that Union owned all of the stock of and managed and operated the water company so that the water company was the alter ego of Union. In affirming the sustaining of the defendants' demurrers without leave to amend, the appellate court held, inter alia, "if the *alter ego* theory were pleaded effectively and if the doctrine is applied, it pleads the contract upon which plaintiff relies *out of existence*; *with only one entity to consider the contract becomes a nullity because it is impossible for a legal entity to contact with itself.*" (*Id.* at p. 444, first italics original, second italics added.)

As in *Luis,* if at any point the Agency actually merged with the Water Company or the Water Company became the alter ego of the Agency, then the Retail Service Agreement, intended to comply with section 12944.7, "becomes a nullity because it is impossible for a legal entity to contact with itself." (*Luis v. Orcutt Town Water Co., supra*, 204 Cal.App.2d at p. 444.) In that case, the Agency would no longer have a contract pursuant to section 12944.7 by which it could sell or deliver water at retail without violating its own enabling act. Logically, if as the result of the challenged transaction, a merger did occur, or the Water Company did become the alter ego of the Agency on September 3, 1999, then the Retail Service Agreement existed for at most four days.

██ The question of whether the corporation exists as a separate corporate entity under the alter ego doctrine, "is one for the trier of fact and is reviewed on appeal according to the usual standards for sufficiency of the evidence to support the conclusion. [Citation.]" (*Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1213 [11 Cal.Rptr.2d 918].) ██ Here, the trial court did not address this issue, notwithstanding that petitioners raised it and supplied exhaustive evidence in support of their alter

ego contention. The form the Water Company has taken, and will ultimately take as the result of the challenged transaction, is central to resolving the issue properly raised in the writ, namely whether the Agency is authorized by section 12944.7 to sell water at retail. It is a factual question premised in the first instance on whether the Water Company became the alter ego of the Agency, whether the corporate veil must be pierced, and if so, whether, in fact, the companies are one and the same. (*Mid-Century, supra*, at p. 1213.) Until such factual questions are resolved by the trial court, we may not review this question. (*Kreeft v. City of Oakland, supra*, 68 Cal.App.4th at p. 53.)[10]

## DISPOSITION

The judgment is reversed and remanded for further proceedings consistent with this opinion. Respondent to pay costs of appeal.

Klein, P. J., and Croskey, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 24, 2001.

---

[10]The Agency argues that the relief petitioners seek is ineffective because the transaction that petitioners want to prohibit has already been consummated. The argument is unavailing because at the time petitioners filed their writ petition, the transaction had not been closed. Just two weeks after the writ petition was filed and one week after the petition was amended, the Agency arranged to pay cash for its transaction and rapidly entered into a stipulation for judgment in the condemnation action. The Agency cannot be heard to complain because it assumed the risk of hurriedly closing the all-cash transaction seemingly to avoid the consequences of the writ petition's allegations. (*Gogerty v. Coachella Valley Junior College Dist.* (1962) 57 Cal.2d 727, 732 [21 Cal.Rptr. 806, 371 P.2d 582].)