Filed 11/28/17 On rehearing

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ROBIN HUTCHESON et al., | C074846 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34-2012-00135467-CU-PO-GDS) |
| v. | |
| ESKATON FOUNTAINWOOD LODGE et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, David I. Brown, Judge. Affirmed.

Beach Cowdrey Owen, Thomas E. Beach and Darryl C. Hottinger for Defendants and Appellants.

Hanson Bridgett, James A. Napoli, Adam W. Hofmann, and Rachel P. Zuraw for California Assisted Living Association as Amicus Curiae on behalf of Defendants and Appellants.

Joanne Handy for LeadingAge California as Amicus Curiae on behalf of Defendants and Appellants.

The Law Office and Edward P. Dudensing for Plaintiffs and Respondents.

1

This case turns on whether an attorney-in-fact made a "health care decision" by admitting her principal to a residential care facility for the elderly and, in the process, agreeing to an arbitration clause. If she did, as the trial court found, she acted outside the scope of her authority under the power of attorney, and the arbitration clause this appeal seeks to enforce is void.

To answer this question, we must define the scope of two statutes, the Power of Attorney Law (Prob. Code, § 4000 et seq. (PAL)), and the Health Care Decisions Law (Prob. Code, § 4600 et seq. (HCDL)), in light of the care a residential care facility for the elderly agreed to provide, and actually provided, in this instance (Health & Saf. Code, § 1569 et seq.), and parse the authority of two of the principal's relatives, one holding a power of attorney under the PAL and one holding a power of attorney under the HCDL.

We conclude admission of decedent to the residential care facility for the elderly in this instance was a health care decision, and the attorney-in-fact who admitted her, acting under the PAL, was not authorized to make health care decisions on behalf of the principal.

As a result of this conclusion, we affirm the trial court's denial of a motion by the residential care facility to compel arbitration. Because the attorney-in-fact acting under the PAL did not have authority to make health care decisions for her principal, her execution of the admission agreement and its arbitration clause are void.

FACTS AND PROCEDURAL HISTORY

For ease of reference, we refer to a power of attorney for health care, as authorized under the HCDL (Prob. Code, § 4671, subd. (a)), as a "health care POA," rather than an advance health care directive. (Prob. Code, § 4673.) For purposes of this decision only, we refer to the statutory form power of attorney set forth in the PAL (Prob. Code, § 4401) as a "personal care POA."

Decedent Barbara Lovenstein executed a health care POA in 2006. She appointed her niece, plaintiff Robin Hutcheson, as her attorney-in-fact to make health care decisions

2

for her.  The authority to make health care decisions included the power to authorize Lovenstein's admission to "any hospital, hospice, nursing home, adult home, or other medical care facility," and the authority to consent to the provision, withholding, or withdrawal of health care.  The health care POA became effective immediately.

Four years later, in 2010, Lovenstein executed a personal care POA, using the form set forth in the PAL.  She designated her sister, plaintiff Jean Charles, and Hutcheson as her attorneys-in-fact.  Lovenstein granted them the authority to act for her on a number of different subjects, including "[p]ersonal and family maintenance," and "[c]laims and litigation."  The form expressly did not authorize anyone to make "medical and other health-care decisions" for her.  Each attorney-in-fact had the authority to act alone on all matters within their authority under the personal care POA that are relevant here.  The personal care POA became effective immediately.

Prior to February 24, 2012, Lovenstein lived with Charles.  At times, Charles served as Lovenstein's care provider; at other times, she oversaw care provided to Lovenstein by in-home care providers, including their administration of medicine.  Charles declared she knew Lovenstein had assigned Hutcheson to make health care decisions.  It was Lovenstein's desire throughout her lifetime that Hutcheson make health care decisions for her.

On February 24, 2012, Charles voluntarily admitted Lovenstein to defendant Eskaton FountainWood Lodge (FountainWood).  FountainWood is a licensed "residential care facility for the elderly" under the California Residential Care Facilities for the Elderly Act (Health & Saf. Code, § 1569 et seq.).  It is owned and operated by defendants Eskaton Properties, Inc., and Eskaton.  Charles signed the admission agreement on behalf of Lovenstein.

The admission agreement contained an arbitration clause.  The clause in general required all claims arising from Lovenstein's care at FountainWood to be submitted to binding arbitration.  The clause bound the parties' heirs, representatives, and successors,

3

and it remained in effect after the admission agreement terminated for the resolution of all claims.

At some point, FountainWood requested to know who Lovenstein had assigned to make health care decisions for her. Hutcheson and Charles provided FountainWood with Lovenstein's health care POA that named Hutcheson as the attorney-in-fact over Lovenstein's health care.

A medical appraisal performed the day of her admission disclosed Lovenstein was suffering from dementia and seizures. She was confused and disoriented. She engaged in inappropriate, aggressive, and wandering behaviors. She was not able to follow instructions consistently, and she was depressed. She required "complete" supervision.

When Lovenstein was admitted to FountainWood, she suffered from epilepsy and had a prescription for Ativan. She was to take the medicine (one mg. dose) only as needed for seizure-like activity. FountainWood staff allegedly began giving Lovenstein more doses of Ativan than were prescribed to help alleviate her anxiety and agitation. Concerned about the staff's increased administration of Ativan for purposes other than seizures, Charles made an appointment for Lovenstein to see her doctor. The doctor found Lovenstein was disoriented as to time, place, and person, which was a "drastic change from earlier visits." The Ativan was prescribed for seizures only, not for anxiety. He concurred in Charles's decision to move Lovenstein back to Charles's home.

On March 22, 2012, Charles went to FountainWood to pack Lovenstein's belongings and move Lovenstein into her home. However, Lovenstein choked on her lunch at FountainWood that day and was transferred to a hospital. Doctors diagnosed her with aspiration pneumonia and severe dysphagia (difficulty in swallowing). She remained hospitalized until March 28, 2012, and died on April 11, 2012.

At Charles's request, FountainWood provided the records it kept on Lovenstein. Lovenstein's health care POA was included in the documents FountainWood gave to Charles.

There is no evidence in the record that Hutcheson, Lovenstein's attorney-in-fact for health care under the health care POA, was contacted by FountainWood or involved in any of the decisions and actions regarding Lovenstein's admission to, stay at, or discharge from FountainWood.

Hutcheson, as successor in interest on behalf of Lovenstein, and Charles sued defendants. In their first amended complaint, Hutcheson sought damages for elder abuse and fraud, and Charles sought damages for negligent infliction of emotional distress.

FountainWood petitioned the trial court to compel arbitration pursuant to the mandatory arbitration clause contained in the admission agreement. The trial court denied the petition, ruling the arbitration agreement was invalid. The court reasoned the admission of Lovenstein to FountainWood and the agreement to arbitrate as part of that admission were health care decisions, and Charles did not have the authority under her personal care POA to make health care decisions for Lovenstein.

FountainWood appeals from the trial court's order. It contends the arbitration agreement is valid because Charles's decision to admit Lovenstein to FountainWood was not a health care decision, and Charles was authorized under the personal care POA to sign the admission agreement and bind Lovenstein and her successors to binding arbitration. FountainWood alternatively contends Lovenstein and Charles created an ostensible agency by failing to inform it that Charles was not authorized to execute the admissions agreement.[1]

---

[1] The California Assisted Living Association and LeadingAge California filed amicus curiae briefs in support of FountainWood.

DISCUSSION

I

*Standard of Review*

" 'Although "[t]he law favors contracts for arbitration of disputes between parties" (*Player v. Geo. M. Brewster & Son, Inc.* [(1971)] 18 Cal.App.3d [526,] 534), " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate. . . .' " (*Weeks v. Crow* (1980) 113 Cal.App.3d 350, 353, quoting *Freeman v. State Farm Mut. Auto. Ins. Co.* [(1975)] 14 Cal.3d [473,] 481 . . . .)' (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744.) 'The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement. (*Garrison v. Superior Court* (2005) 132 Cal.App.4th 253, 263 (*Garrison*); *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972; *Pagarigan v. Libby Care Center, Inc.* (2002) 99 Cal.App.4th 298, 301 [].) Petitions to compel arbitration are resolved by a summary procedure that allows the parties to submit declarations and other documentary testimony and, at the trial court's discretion, to provide oral testimony. (*Engalla, supra,* 15 Cal.4th at p. 972; Code Civ. Proc., §§ 1281.2, 1290.2.) If the facts are undisputed, on appeal we independently review the case to determine whether a valid arbitration agreement exists. (*Garrison, supra,* 132 Cal.App.4th at p. 263; *Buckner v. Tamarin* (2002) 98 Cal.App.4th 140, 142.)' (*Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 586 (*Flores*).)

"As the *Flores* court explained, 'Generally, a person who is not a party to an arbitration agreement is not bound by it. (*Buckner v. Tamarin, supra,* 98 Cal.App.4th at p. 142.) However, there are exceptions. For example, a *patient* who signs an arbitration agreement at a health care facility can bind relatives who present claims arising from the patient's treatment. (*Mormile v. Sinclair* (1994) 21 Cal.App.4th 1508, 1511-1516; *Bolanos v. Khalatian* (1991) 231 Cal.App.3d 1586, 1591.) Further, a person who is authorized to act as the patient's *agent* can bind the patient to an arbitration agreement.

6

(*Garrison, supra,* 132 Cal.App.4th at pp. 264-266; see *Buckner, supra,* 98 Cal.App.4th at p. 142.)' (*Flores, supra,* 148 Cal.App.4th at p. 587, fn. omitted.)" (*Goldman v. SunBridge Healthcare, LLC* (2013) 220 Cal.App.4th 1160, 1169, original italics.)

II

*Admission to FountainWood was a Health Care Decision*

This case pivots on whether Charles's admitting Lovenstein to FountainWood and executing the arbitration clause was a "health care" decision. Lovenstein's personal care POA did not authorize Charles to make health care decisions for Lovenstein. Neither the personal care POA nor the PAL define a health care decision. However, the HCDL does define a health care decision, and it applies to all health care POA's. (Prob. Code, § 4665, subd. (a).) Because the HCDL defines the services a personal care POA cannot authorize, we rely on that law to help us determine the scope of Charles's authority under the personal care POA and whether executing the admission agreement with its arbitration clause was a health care decision.[2] We conclude it was a health care decision beyond Charles's authority to make under the personal care POA.

Our analysis seeks primarily to understand the Legislature's intent for adopting the HCDL and its definitions. We employ familiar rules of statutory construction. "Our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than

---

[2]    The parties did not discuss the HCDL in their initial briefing. At our request, they discussed it in supplemental briefing.

7

one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.  [Citations.]"  (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

Charles's authority under Lovenstein's personal care POA is set forth in the PAL. Under that law, a personal care POA may authorize, as Lovenstein's does here, the attorney-in-fact to make decisions regarding the principal's "personal care" and her "claims and litigation," and to enter into contracts to accomplish those purposes.  (Prob. Code, §§ 4123, subd. (a), 4450, subd. (b), 4459, subd. (d), 4460, subd. (a).)  This authority empowered Charles to make decisions relating to Lovenstein's personal care and to maintain Lovenstein's customary standard of living, including providing living quarters by purchase, lease or other contract; providing for normal domestic help; paying for Lovenstein's shelter, clothing, food, and other current living costs; providing transportation; handling mail; arranging recreation and entertainment; and paying for Lovenstein's necessary medical, dental, and surgical care, hospitalization, and custodial care.  (Prob. Code, §§ 4123, subd. (c), 4460, subd. (a)(1), (2), (3).)

The authority regarding Lovenstein's claims and litigation includes the authority to submit claims to arbitration.  (Prob. Code, § 4450, subd. (d).)  It also includes the authority to "[c]ontract in any manner with any person, on terms agreeable to the [attorney-in-fact], to accomplish a purpose of a transaction . . . ."  (Prob. Code, § 4450, subd. (b).)

However, the PAL does not apply to health care POA's, and the personal care POA does not authorize an attorney-in-fact to make decisions regarding the principal's "health care."  (Prob. Code, §§ 4050, subd. (a)(1), 4401.)

8

By contrast, the HCDL authorizes a competent adult to execute a power of attorney for "health care." (Prob. Code, § 4671, subd. (a).)[3] The health care POA may authorize the attorney-in-fact to make "health care decisions" for the principal. (Prob. Code, § 4671, subd. (a).) For purposes of the HCDL and, by extension, the PAL and its statutory form personal care POA, the term " '[h]ealth care' " means "any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect a patient's physical or mental condition." (Prob. Code, § 4615.) A " '[h]ealth care decision' " is "a decision made by a patient or a patient's agent, conservator, or surrogate, regarding the patient's health care, including . . . [s]election and discharge of health care providers and institutions." (Prob. Code, § 4617.) A " '[h]ealth care provider' " is "an individual licensed, certified, or otherwise authorized or permitted by the law of this state to provide health care in the ordinary course of business or practice of a profession." (Prob. Code, § 4621.) A " '[h]ealth care institution' " is "an institution, facility, or agency licensed, certified, or otherwise authorized or permitted by law to provide health care in the ordinary course of business." (Prob. Code, § 4619.)

These are very broad definitions, and at first glance they appear to define the care FountainWood agreed to provide Lovenstein. "Health care" is defined as "any" care or service that maintains or affects a person's physical or mental condition, a "health care provider" is an individual authorized or permitted to provide "health care" in the ordinary course of business, and a "health care institution" is a facility licensed to provide such "health care" as its business

---

[3]     The HCDL uses the term " '[a]gent' " to describe the principal's attorney-in-fact (Prob. Code, § 4607), while the PAL uses the term " '[a]ttorney-in-fact' " regardless of whether the person is known as an attorney-in-fact or agent. (Prob. Code, § 4014.) For the sake of consistency, we use the term "attorney-in-fact" to describe the principal's attorney-in-fact under both sets of statutes.

We recognize the term "health care" cannot be read for purposes of the PAL and the HCDL as literally "any" care that affects a person's condition. To do so would include within its scope much of what the Legislature has classified as "personal care" under the PAL. And the Legislature has clearly stated that "personal care" is not "health care" for purposes of the personal care POA.[4]

The PAL and the HCDL define personal care primarily as providing for the necessities of living at a basic level. Neither law mentions making decisions about the principal's health care other than paying for it. But is a decision to place someone in a residential care facility for the elderly, particularly to receive dementia care, more than providing for the basic necessities of living? We conclude it is in this case. Charles contracted with FountainWood to provide Lovenstein with health care as well as personal care.

A residential care facility for the elderly is statutorily defined as "a housing arrangement chosen by persons 60 years of age or over, or their authorized representative, where varying levels and intensities of care and supervision, protective supervision, personal care, or health-related services are provided, based upon their varying needs . . . ." (Health & Saf. Code, § 1569.2, subd. (o).) The Legislature in 1985 stated it created the separate licensing category for residential care facilities for the elderly because they provided multiple levels of care, including some forms of medical care. The Legislature stated in pertinent part: "(c) The Community Care Facilities Act

---

[4] A health care POA may also authorize the attorney-in-fact to make decisions regarding the principal's personal care. The HCDL defines "personal care" similarly to the PAL. It allows, but does not require, a power of attorney for health care to authorize the attorney-in-fact to make decisions regarding the principal's "personal care," including, but not limited to, "determining where the principal will live, providing meals, hiring household employees, providing transportation, handling mail, and arranging recreation and entertainment." (Prob. Code, § 4671, subd. (b).)

was enacted in 1973 with the primary purpose of ensuring that residents of state hospitals would have access to safe, alternative community-based housing.

"(d) Since that time, due to shortages in affordable housing and a greater demand for residences for the elderly providing some care and supervision, a growing number of elderly persons with health and social care needs now reside in community care facilities that may or may not be designed to meet their needs.

"(e) Progress in the field of gerontology has provided new insights and information as to the types of services required to allow older persons to remain as independent as possible while residing in a residential care facility for the elderly.

"(f) The fluctuating health and social status of older persons demands a system of residential care that can respond to these needs by making available *multilevels of service within the facility*, thus reducing the need for residents with fluctuating conditions *to move between medical and nonmedical facilities*.

"(g) Residential care facilities for the elderly which are *not primarily* medically oriented represent a humane approach to meeting the housing, social and service needs of older persons, and can provide a homelike environment for older persons with a variety of care needs." (Health & Saf. Code, § 1569.1, subds. (c)-(g), italics added.)

Residential care facilities are "not primarily medically oriented" (Health & Saf. Code, § 1569.1, subd. (g)), and much of what they provide is personal care. By providing "care and supervision" (Health & Saf. Code, § 1569.2, subd. (o)(1)), the "facility assumes responsibility for, or provides or promises to provide in the future, ongoing assistance with activities of daily living without which the resident's physical health, mental health, safety, or welfare would be endangered. Assistance includes assistance with taking medications, money management, or personal care." (Health & Saf. Code, § 1569.2, subd. (c).) The facility may provide "personal care" (Health & Saf. Code, § 1569.2, subd. (o)(1)), such as "assistance with personal activities of daily living, to help provide for and maintain physical and psychosocial comfort." (Health & Saf. Code, § 1569.2,

11

subd. (m).) " 'Personal activities of daily living' " include "dressing, feeding, toileting, bathing, grooming, and mobility and associated tasks." (Health & Saf. Code, § 1569.2, subd. (*l*).)

However, residential care facilities for the elderly may also provide types of care that go beyond personal care and include health care. For example, a residential care facility for the elderly may provide dementia care. This is a higher level of care administered by staff members specifically trained on issues of "hydration, skin care, communication, therapeutic activities, behavioral challenges, the environment, and assisting with activities of daily living." (22 Cal. Code Regs., § 87705, subd. (c)(3)(A).) In addition, residential care facilities for the elderly are authorized to provide "incidental medical services" for patients who have what the regulations call "restricted health conditions" or require any of the following services: administration of oxygen; catheter care; colostomy/ileostomy care; contractures; diabetes; enemas, suppositories, and/or fecal impaction removal; incontinences of bowel and/or bladder; injections; intermittent positive pressure breathing machine use; certain pressure sores; and wound care. (Health & Saf. Code, § 1569.725; 22 Cal. Code Regs. §§ 87609, subd. (a), 87612.)[5]

Since the parties completed initial briefing in this appeal, the Legislature has clarified that residential care facilities for the elderly that accept patients with restricted health conditions must ensure those residents "receive *medical care* as prescribed by the resident's physician . . . by appropriately skilled professionals acting within the scope of their practice." (Health & Saf. Code, § 1569.39, subd. (b), italics added.) Such skilled professionals include "a registered nurse, a licensed vocational nurse, physical therapist, occupational therapist, or respiratory therapist." (*Id*. at subd. (c).) The residential care facility for the elderly may employ these professionals. (*Ibid*.)

---

[5] It is not clear from the admissions agreement whether FountainWood agreed to provide any incidental medical services to Lovenstein.

We also infer from the PAL's definition of personal care that some forms of custodial care may qualify as health care. The PAL defines personal care in part as paying for "necessary medical, dental, and surgical care, hospitalization, and custodial care." (Prob. Code, § 4460, subd. (a)(3).) By including custodial care in a list of obvious types of health care and authorizing the attorney-in-fact only to pay for that care, the Legislature recognized some forms of custodial care are health care for purposes of power of attorney laws.

Care and services involving health care cannot be authorized by an attorney-in-fact acting only under a personal care POA. When residential care facilities for the elderly provide health care, they and their employees who provide such care are, respectively, "health care institutions" and "health care providers" for purposes of the HCDL, and a third-party contracting for these services as agent for another person may not do so when acting under a personal care POA.

FountainWood contends it did not agree to provide, nor did it provide, health care to Lovenstein. We disagree. The record demonstrates Charles, acting under her personal care POA, contracted with FountainWood to provide health care. Among other things, FountainWood agreed to provide dementia care as part of its custodial care. As stated earlier, this higher level of care required staff members to be trained on issues that included health care, such as hydration, skin care, therapeutic activities and behavioral challenges. (22 Cal. Code Regs., § 87705, subd. (c)(3)(A).)

There is little doubt the Legislature intended the type of custodial care FountainWood agreed to provide Lovenstein to qualify as health care for purposes of the HCDL and the personal care POA. The HCDL's definition of "health care" was derived from and is virtually identical to its definition originally contained in the Uniform Law Commissioners' Model Health-Care Consent Act (the Uniform Consent Act), a model health care representative law adopted by the National Conference of Commissioners on Uniform State Laws in 1982. (Handbook of the Nat. Conf. of Comrs. on U. State Laws

13

& Proceedings 298 (1982) (Handbook).)[6] The National Conference of Commissioners explained the Uniform Consent Act's definition of "health care" was "*broader* in scope than medical care and includes care and treatment which is lawful to practice under state law, for instance, nursing care." (*Id*. at p. 301, italics added.) The Legislature adopted this definition when it enacted the HCDL's predecessor statute. (Stats. 1983, ch. 1204, § 10, p. 4615; see 17 Cal. Law Revision Com. Rep. (1984) pp. 103, 117-118.)

In 1999, in response to a new uniform act, the Uniform Health-Care Decisions Act (9 West's U. Laws Ann. (2005) U. Health-Care Decisions Act, pp. 83, 85), the California Law Revision Commission proposed, and the Legislature adopted, the HCDL. (Stats. 1999, ch. 658, § 39, p. 4860; see 29 Cal. Law Revision Com. Rep. (1999) pp. 1, 5.) The HCDL drew "heavily" from the Uniform Health-Care Decisions Act. (29 Cal. Law Revision Com. Rep., *supra*, at p. 5.) It reenacted the same definition of " '[h]ealth care,' " and it enacted for the first time the definitions of " '[h]ealth care decision' " and " '[h]ealth care institution' " as described above. (Prob. Code, §§ 4615, 4617, 4619, 4621.)

The Law Revision Commission's comments on the terms " '[h]ealth care' " and " '[h]ealth care institution' " show it intended those terms to apply to custodial care and residential care facilities that provide custodial care. Adopting comments made by the National Conference of Commissioners, the Law Revision Commission stated the "definition of 'health care' . . . is to be given the broadest possible construction. It includes . . . care, including *custodial care*, provided at a 'health-care institution' . . . ." (9 West's U. Laws Ann., *supra*, U. Health-Care Decisions Act, p. 90, com., italics added.) "The term 'health-care institution' . . . includes a hospital, nursing home,

---

**6**    The Uniform Consent Act defined " '[h]ealth care' " as "any care, treatment, service, or procedure to maintain, diagnose, or treat an individual's physical or mental condition." (Handbook, *supra*, at p. 300.)

14

*residential-care facility*, home health agency or hospice." (*Ibid*., italics added.) (Prob. Code, §§ 4615, 4619.)

" '[T]he official comments of the California Law Revision Commission "are declarative of the intent not only of the draftsman of the code but also of the legislators who subsequently enacted it" [citation], [and thus] the comments are persuasive, albeit not conclusive, evidence of that intent [citation].' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1132.) Here, the history and comments, in light of the statute's language, demonstrate the Legislature intended the HCDL to apply to decisions concerning custodial care rendered by a residential care facility for the elderly that involve health care. An attorney-in-fact such as Charles operating under a personal care POA, as opposed to a health care POA, does not have the authority to obtain such health care for her principal.

FountainWood argues we have it wrong. In addition to asserting it did not contract to provide health care, an argument we just rejected, FountainWood contends Charles's executing the admission agreement was not a health care decision because FountainWood is not a "health care institution." It argues it is not a "health care institution" because it is not treated as a "health facility" under statutes other than the HCDL and the PAL, and it is not a "health care institution" under the terms of the HCDL itself. At oral argument, FountainWood also argued the arbitration clause was enforceable because Charles had authority outside of that personal care POA to admit Lovenstein and she had authority under the personal care POA to submit claims to arbitration. We disagree with each argument.**7**

---

**7**     The parties also cite us to cases that dispute whether the authority to make a health care decision under a health care POA includes the authority to execute arbitration agreements. In *Hogan v. Country Villa Health Services* (2007) 148 Cal.App.4th 259, 267-268, and *Garrison, supra*, 132 Cal.App.4th at pages 265-266, the courts held the decision to admit someone to a particular care facility is a health care decision, and the execution of arbitration agreements as part of the admission process is part of the health

FountainWood asserts it should not be treated as a "health care institution" under the HCDL because it is not licensed or treated as a health facility under other statutory schemes. The argument is not persuasive. The Legislature defined a "health care institution" in the HCDL more broadly than it defined a "health facility" and a "health care provider" in other statutes, and it did so because it intended the terms to have different meanings in their respective contexts.

FountainWood correctly states it is not a licensed "health facility" for purposes of licensing requirements imposed on medical care facilities. State statute requires persons and entities to obtain a license to operate a health facility. (Health & Saf. Code, § 1253.) For purposes of this rule, Health and Safety Code section 1250 defines a " 'health facility' " as "a facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation . . . to which the persons are admitted for a 24-hour stay or longer . . . ." Such a health facility includes general acute care hospitals, acute psychiatric hospitals, skilled nursing facilities, and intermediate care facilities. (Health & Saf. Code, § 1250.) A residential care facility for the elderly is not a "health facility" under Health and Safety Code section 1250. (Health & Saf. Code, § 1569.145, subd. (a).)

FountainWood also correctly states because it is not a health facility under Health and Safety Code section 1250, it is not entitled to the liability protections provided to

care decisionmaking process. However, in *Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1129, the court, without expressly stating whether a decision to admit someone to a care facility is a health care decision, ruled in dicta that the authority to make health care decisions under a health care POA did not include the authority to execute an arbitration agreement unless expressly granted in the health care POA. In any event, it did not say the holder of a personal care POA can execute an arbitration clause in a health care agreement while lacking authority to execute the health care agreement itself. Charles in this instance made a health care decision she had no authority to make under the personal care POA.

16

health facilities under the Medical Injury Compensation Reform Act of 1975 (Civ. Code, § 3333.2, subd. (b) (MICRA)).  MICRA caps noneconomic damages a plaintiff may recover in a medical malpractice action against a " '[h]ealth care provider.' "  (Civ. Code, § 3333.2, subd. (b).)  The statute defines a health care provider in part as "any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code."  (Civ. Code, § 3333.2, subd. (c)(1).)  As mentioned previously, a residential care facility for the elderly is not a "health facility," nor is it a clinic or a health dispensary, under Health and Safety Code section 1250, and thus it does not qualify as a "health care provider" for purposes of MICRA.  (See *Kotler v. Alma Lodge* (1998) 63 Cal.App.4th 1381, 1392-1394 (*Kotler*) [a residential care facility, a type of community care facility, is not a "health facility" under Health and Safety Code section 1250 and thus not protected by MICRA].)[8]

FountainWood also directs us to statutes that govern patient access to their health care records.  One of these statutes authorizes an adult patient of a "health care provider" to gain access to his or her patient records.  (Health & Saf. Code, § 123110, subd. (a).)  For purposes of this statute, a "health care provider" is a "health facility" as defined in

---

[8]    The California Community Care Facilities Act (Health & Saf. Code, § 1500 et seq.) defines a community care facility as "any facility, place, or building that is maintained and operated to provide *nonmedical* residential care, day treatment, adult day care, or foster family agency services for. . . the physically handicapped, mentally impaired, incompetent persons, and abused or neglected children . . . ."  (Health & Saf. Code, § 1502, subd. (a), italics added.)  This definition includes a " '[r]esidential facility,' " which is defined as "any family home, group care facility, or similar facility determined by the director [of the Department of Social Services], for 24-hour *nonmedical* care of persons in need of personal services, supervision, or assistance essential for sustaining the activities of daily living or for the protection of the individual."  (Health & Saf. Code, § 1502, subd. (a)(1), italics added.)  At two points in its opening brief, FountainWood asserts it is such a residential care facility.  The assertion is incorrect.  Residential care facilities for the elderly "shall not be considered community care facilities and shall be subject only to the California Residential Care Facilities for the Elderly Act . . . ."  (Health & Saf. Code, § 1502.5.)

17

Health and Safety Code section 1250, as well as a number of specified health care professionals, including physicians, surgeons, podiatrists, dentists, psychologists, and various therapists.  (Health & Saf. Code, § 123105, subd. (a).)  A residential care facility for the elderly is not a "health care provider" for purposes of the statute allowing patient access to patient records.

None of these statutes, however, mandates how we interpret the HCDL and the PAL and whether FountainWood is a "health care institution" that provides "health care" under those laws.  Heath care is defined differently for purposes of the PAL than it is defined in the statutes FountainWood recites.  " '[W]hen the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the legislature intended a difference in meaning.  [Citation.]' [Citation.]" (*Kleffman v. Vonage Holdings Corp*. (2010) 49 Cal.4th 334, 342.)

The Legislature adopted the HCDL not as a means of regulating the provision of health care, but as a way to protect an adult's "fundamental right to control the decisions relating to his or her own health care" and to protect "individual autonomy."  (Prob. Code, § 4650, subds. (a), (b).)  To meet these purposes, the Legislature defined " '[h]ealth care,' " " '[h]ealth care provider,' " and " '[h]ealth care institution' " expansively and differently than it defined those terms and related terms in other statutes.  It defined " '[h]ealth care' " as "any" care or service to maintain or affect a person's physical or mental condition.  (Prob. Code, § 4615.)  It defined a " '[h]ealth care provider' " and a " '[h]ealth care institution' " as any individual and institution authorized by law to provide such broad "health care."  (Prob. Code, §§ 4619, 4621.)  Serving a different purpose, the other uses of the terms "health facility" and "health care provider" have little relevance here.

FountainWood contends the reasoning in *Kotler, supra,* 63 Cal.App.4th 1381, should apply here.  *Kotler* does not help FountainWood.  The *Kotler* court determined a residential care facility for the mentally ill, a type of community care facility, was not a

"health facility" under Health and Safety Code section 1250 and thus not entitled to the protections of MICRA. The appellate court acknowledged the facility provided "incidental medical services" and "health-related services" (*Kotler, supra,* 63 Cal.App.4th at pp. 1393-1394) similar to those that residential care facilities for the elderly may provide. However, the court held a "residential care facility which provides only incidental medical services is not a health facility." (*Id.* at p. 1394, italics omitted.) It would be a health facility only if the medical services it provided constituted "a substantial component of the total services provided." (*Id.* at p. 1393.)

*Kotler* did not consider whether a residential care facility for the elderly was a "health care institution" under the HCDL and for purposes of defining the scope of a personal care POA. Unlike Health and Safety Code section 1250, as interpreted by *Kotler*, the HCDL does not define a "health care institution" as only those facilities whose provision of medical care constitutes a substantial component of the total services provided. As we explained, it defines a health care institution as any entity that provides care—any care—to maintain or affect a person's physical or mental condition. We and the *Kotler* court are addressing different questions.

Even if FountainWood was not a health care institution, its employees who provide care or services that include health care to maintain a person's physical or mental condition qualify as health care providers for purposes of the HCDL and, in turn, the personal care POA. Charles did not have authority under her personal care POA to engage those employees to provide health care to Lovenstein.

FountainWood next raises a different line of attack. Instead of arguing we should interpret the HCDL and the personal care POA consistent with other statutes that apply to medical care facilities, FountainWood directs us to provisions in the HCDL it claims show the Legislature did not intend to classify residential care facilities for the elderly as "health care providers" or "health care institutions" for purposes of the HCDL. These provisions expressly define and apply to residential care facilities for the elderly in

addition to health care providers and institutions. FountainWood contends the Legislature would not have separately defined residential care facilities for the elderly if those facilities were included in the definitions of health care providers or institutions, and defining a residential care facility for the elderly to be a "health care provider" or a "health care institution" under the HCDL creates surplusage. We disagree.

The HCDL, in addition to defining a "health care provider" and a "health care institution," specifically defines a "residential care facility for the elderly" and gives that term its statutory definition found in Health and Safety Code section 1569.2, quoted above. (Prob. Code, § 4637.)[9] The HCDL uses the phrase in two statutes designed to prevent conflicts of interest. In neither case, however, does the phrase become surplusage under our interpretation of the terms "health care institution" and "health care provider."

In one such statute, Probate Code section 4674, the HCDL prohibits "[t]he patient's health care provider or an employee" of that provider and the "operator or an employee of a residential care facility for the elderly" from witnessing the execution of a health care POA. (Prob. Code, § 4674, subd. (c); see Prob. Code, §§ 4680, 4673.) FountainWood argues the Legislature would not have separately prohibited operators and employees of residential care facilities for the elderly from serving as witnesses if such individuals were "health care providers" or employees of a "health care provider" for purposes of the HCDL.

Another statute, Probate Code section 4659, prohibits the "supervising health care provider or an employee of the health care institution where the patient is receiving care" and an operator or employee of a "residential care facility" where the patient is receiving

---

**9**    The HCDL also defines a " '[c]ommunity care facility' " and gives that term its statutory definition found in Health and Safety Code section 1502, subdivision (c). (Prob. Code, § 4611.)

20

care from serving as an attorney-in-fact under a health care POA. (Prob. Code, § 4659, subd. (a)(1), (2).) FountainWood contends if the Legislature had intended residential care facilities for the elderly to be considered as "health care institutions" for purposes of the HCDL, it would not have separately prohibited operators and employees of residential care facilities from serving as attorneys-in-fact. Such individuals would have been included in the reference to employees of "health care institutions."

Under our interpretation of the HCDL, there is no surplusage. The Legislature was concerned about conflicts of interest and fraud, and it recognized residents and potential residents of residential care facilities faced those risks not only from health care providers and institutions and their employees, but also from employees and operators of residential care facilities that provided only personal care and who were not health care providers. It thus reasonably extended these conflict-of-interest prohibitions to apply to persons who otherwise were not addressed in the HCDL.

In its reply brief and at oral argument, FountainWood raised another argument. It contended Charles had authority to admit Lovenstein outside of the personal care POA, and, combined with the authority granted under the personal care POA to submit claims to arbitration, she could agree to the arbitration clause as part of admitting Lovenstein. In other words, whether or not admitting Lovenstein was a health care decision, agreeing to the arbitration clause was not. FountainWood did not raise this argument in its opening brief, and, accordingly, has forfeited it. (*Julian v Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4.) Even if FountainWood had raised the argument, we would reject it. Charles did not have authority to execute the health care agreement, including the arbitration clause, because Hutcheson's authority was known to FountainWood.

Persons other than those named as attorneys-in-fact under a health care POA may admit someone to a residential care facility for the elderly. Obviously, conservators and guardians have this authority. State regulations also authorize a person to be admitted by her spouse or family member. (22 Cal. Code Regs. §§ 87101, subd. (r)(3), (r)(5), (r)(6);

21

87457, subd. (b); 87507, subd. (c).) The HCDL also authorizes a patient to designate a surrogate to make health care decisions whether or not the patient has a health care POA. (Prob. Code, § 4711.) And case law has recognized the authority of next of kin to make health care decisions for an incompetent relative who did not make a health care POA or designate a surrogate. (See *Barber v. Superior Court* (1983) 147 Cal.App.3d 1006, 1020-1021 [wife was proper surrogate to decide whether to withdraw life support from husband].)

Moreover, a person named as an attorney-in-fact in a health care POA may not necessarily have exclusive authority to make health care decisions on behalf of her principal. But such an attorney-in-fact "has priority over any other person in making health care decisions" for the resident so long as the attorney-in-fact "is known to the health care provider to be reasonably available and willing to make health care decisions." (Prob. Code, § 4685.) That was the situation in this case.

FountainWood possessed Lovenstein's health care POA naming Hutcheson as Lovenstein's health care agent, thereby giving her priority over Charles with regard to health care decisions. In her declaration, Hutcheson testified: "We submitted [Lovenstein's health care POA] to Eskaton Fountainwood Lodge in connection with Eskaton's request to know who my aunt had assigned to make health care decisions for her." By giving the health care POA to FountainWood, Hutcheson informed FountainWood she was available and willing to make health care decisions for Lovenstein. As a result, because the admission agreement in this instance was a health care agreement, FountainWood was obligated to seek Hutcheson's consent and her agreement to the arbitration clause before it could rely on any authority Charles may have had to agree to arbitration. We would not be discussing an arbitration agreement had Charles not made a health care decision. Without that decision, there is no arbitration agreement in dispute. And we will not extend the authority to execute arbitration

22

agreements in non-health care related matters to the very matters for which the authority is expressly denied.

FountainWood complains that being subject to the HCDL is unfair. It contends it is unfair for plaintiffs to claim FountainWood is a "health care institution" under the HCDL in order to void the arbitration agreement, and then later claim FountainWood is not a "health facility" or a "health care provider" under MICRA and thus not protected by MICRA's cap on noneconomic damages. While we understand FountainWood's concern, we must leave it to the Legislature to address that issue. In the meantime, residential care facilities for the elderly can protect themselves against unlimited liability by ensuring its health care agreements containing arbitration clauses are executed by persons having legal authority to do so. Charles was not such a person in this case.

Ultimately, "a court must adopt the construction most consistent with the apparent legislative intent and most likely to promote rather than defeat the legislative purpose and to avoid absurd consequences." (*In re J.W.* (2002) 29 Cal.4th 200, 213.) Our interpretation meets that standard. The Legislature intended that a decision to admit someone to a residential care facility for the elderly for the provision of health care is a health care decision under the HCDL, and it required that such a health care decision, if made pursuant to a power of attorney, be made pursuant to a health care POA. A personal care POA under the PAL does not authorize the attorney-in-fact to make a health care decision. As a result, Charles's decision to agree to arbitration as part of admitting Lovenstein is void as she had no authority to execute an arbitration agreement as part of making a health care decision.

III

*Ostensible Agency*

FountainWood contends Charles's and Lovenstein's behavior led FountainWood to believe Charles had the authority to execute the arbitration agreement and thus created an ostensible agency we should enforce. We disagree.

23

"An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.) "Even when there is no written agency authorization, an agency relationship may arise by oral consent or by implication from the conduct of the parties. (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571.) However, an agency cannot be created by the conduct of the agent alone; rather, *conduct by the principal* is essential to create the agency. Agency 'can be established either by agreement between the agent and the principal, that is, a true agency [citation], or it can be founded on ostensible authority, that is, some intentional conduct or neglect on the part of the alleged principal creating a belief in the minds of third persons that an agency exists, and a reasonable reliance thereon by such third persons.' (*Lovetro v. Steers* (1965) 234 Cal.App.2d 461, 474-475; see Civ. Code, §§ 2298, 2300.) ' " 'The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.' . . . " [Citations.] Thus, the "formation of an agency relationship is a bilateral matter. Words or conduct by *both principal and agent* are necessary to create the relationship . . . ." ' (*van't Rood, supra,* 113 Cal.App.4th at p. 571, italics added.)" (*Flores, supra,* 148 Cal.App.4th at pp. 587-588.)

FountainWood introduced no facts showing Lovenstein intentionally or negligently caused it to believe Charles was her agent for purposes of executing the health care agreement containing the arbitration clause. FountainWood argues there is no evidence Lovenstein or Charles affirmatively informed it that Charles was not authorized to execute the agreement. FountainWood, however, came into possession of Lovenstein's health care POA that named Hutcheson as Lovenstein's health care attorney-in-fact, yet it did not raise the discrepancy with Charles or Hutcheson or seek Hutcheson's authorization to render health care to Lovenstein and execute the arbitration agreement. Lovenstein's silence and possible lack of capacity do not constitute negligence in this instance. No ostensible agency was created.

24

## DISPOSITION

The order of the trial court denying FountainWood's motion to compel arbitration is affirmed.  Costs on appeal are awarded to plaintiffs.  (Cal. Rules of Court, rule 8.278(a).)


                                                                  _____NICHOLSON_____, Acting P. J.


We concur:


_____MAURO_____, J.


_____DUARTE_____, J.