Filed 8/7/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DIANE HOLLEY, Individually and as a Conservator, etc., et al.,<br><br>     Plaintiffs and Respondents,<br><br>          v.<br><br>SILVERADO SENIOR LIVING MANAGEMENT, INC., et al.,<br><br>     Defendants and Appellants. | G058576<br><br>(Super. Ct. No. 30-2019-01045608)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

Giovanniello Law Group, Alexander F. Giovanniello, Daniel F. McCann and Erik M. Bressler for Defendants and Appellants.

Gharibian Law, Art Gharibian, Alexander H. Feldman and Valentina Ambarchyan for Plaintiffs and Respondents.

BraunHagey & Borden, Matthew Borden, J. Noah Hagey and Athul K. Acharya as Amicus Curiae on behalf of Plaintiffs and Respondents.

*          *          *

Defendants Silverado Senior Living Management, Inc., and Subtenant 350 W. Bay Street, LLC dba Silverado Senior Living – Newport Mesa (collectively Silverado or defendants) appeal from the trial court's order denying its petition to compel arbitration of the complaint filed by plaintiffs Diane Holley, both individually and as successor in interest to Elizabeth S. Holley, and James Holley (collectively the Holleys or plaintiffs).[1] Plaintiffs brought suit against defendants, who operate a senior living facility, for elder abuse and neglect, negligence, and wrongful death, based on defendants' alleged substandard treatment of Elizabeth.

More than eight months after the complaint was filed, defendants moved to arbitrate based on an arbitration agreement Diane had signed upon Elizabeth's admission. At the time, Diane and James were temporary conservators of Elizabeth's person. The court denied the motion, finding that at the time Diane signed the document, there was insufficient evidence to demonstrate she had the authority to bind Elizabeth to the arbitration agreement. Defendants argue this ruling was incorrect as a matter of law, and that pursuant to the Probate Code, the agreement to arbitrate was a "health care decision" to which a conservator had the authority to bind a conservatee, relying on a case from the Third District Court of Appeal, *Hutcheson v. Eskaton FountainWood Lodge* (2017) 17 Cal.App.5th 937 (*Hutcheson*).

We conclude that *Hutcheson* and other cases on which Silverado relies are distinguishable on the facts and relevant legal principles. When the Holleys signed the arbitration agreement, they were temporary conservators of Elizabeth's person, and therefore, they lacked the power to bind Elizabeth to an agreement giving up substantial rights without her consent or a prior adjudication of her lack of capacity. Further, as merely temporary conservators, the Holleys were constrained, as a general matter, from making long-term decisions without prior court approval.

---

[1] For the ease of the reader, when necessary, we refer to the Holleys by their first names.

Accordingly, the trial court was correct that the arbitration agreement is unenforceable as to Elizabeth. Further, because there was no substantial evidence that the Holleys intended to sign the arbitration agreement on their own behalf, it cannot be enforced against their individual claims. We therefore affirm the court's order denying Silverado's motion to compel arbitration.

I

FACTS

At the time of Elizabeth's admission to Silverado, she was 77 years old and suffering from dementia and other medical problems. In January 2017, professional conservators Rob Saslow and Stacey Haft were appointed temporary conservators of Elizabeth's estate, with an expiration date of October 25.

In August 2017, Diane and James were appointed temporary conservators of Elizabeth's person, but not her estate. On October 26, they signed paperwork for Elizabeth's admission to Silverado.

According to Diane, she was presented with "a stack of paperwork to sign relating to my mother's admission at Silverado . . . . [An employee] told me to sign my name to the signature line on various forms . . . . There were a lot of forms to be signed that day. More emphasis was given to the forms that needed information about my mom's needs regarding her activities of daily living as opposed to forms where she just needed my signature. There was a great sense of urgency to the admissions process in which I signed these numerous forms. I was told several times that beds go very quickly at Silverado and that if I did not get all the forms signed and completed and a check deposited, that the bed could go to someone else on the waiting list. . . . At no point did anyone from Silverado explain to me that part of the admission paperwork contained an arbitration agreement and that it was not a condition for my mother's admission."

Among the documents was one entitled "Resident-Community Arbitration Agreement" (the arbitration agreement), which stated it was voluntary and not a condition of admission. The arbitration agreement stated: "The undersigned certifies that he/she has read this Agreement, and has been given a copy, and is either the Resident and/or is the representative/agent of the Resident, duly authorized to execute the above and accept its terms. [¶] *Based on the Resident's Mental Capacity, the term Resident may include Responsible Party, POA, Guardian and/or Conservator.*"

Diane signed the arbitration agreement and James signed underneath Diane's name. Elizabeth did not sign the document.

On October 30, a hearing was held on Diane and James's petition, as temporary conservators of Elizabeth's person, to place her at Silverado. The petition was granted. Additionally, the court ordered Diane and James to assume the role of conservator of both Elizabeth's person and her estate temporarily, with an expiration date of April 25, 2018. The court's October 30th order gave Diane and James specific authority to place Elizabeth in a locked facility and made the requisite findings under the Probate Code.

Elizabeth was admitted to Silverado from November 1 until November 10, 2017. On November 4, she was transferred to Hoag Hospital after an X-ray revealed a humeral fracture, and she returned the same day with her arm in a sling. She also suffered a hip fracture and a number of bruises, according to the complaint. She had surgery on November 10, and she passed away on February 10, 2018.

On January 22, 2019, James and Diane, individually, and Diane, as Elizabeth's successor in interest, filed the instant lawsuit, alleging elder abuse, negligence, breach of contract, and wrongful death.

In October 2019, defendants filed the instant motion to compel arbitration. After briefing and a hearing, the court denied the motion.

4

II

DISCUSSION

A. *General Principles and Standard of Review*

"California has a strong public policy in favor of arbitration as an expeditious and cost-effective way of resolving disputes. [Citation.] Even so, parties can only be compelled to arbitrate when they have agreed to do so. [Citation.] 'Arbitration . . . is a matter of consent, not coercion . . . .' [Citation.] Whether an agreement to arbitrate exists is a threshold issue of contract formation and state contract law. [Citations.] The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement." (*Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 843-844.)

With respect to the standard of review, "'[t]here is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed.'" (*Laswell v. AG Seal Beach, LLC* (2010) 189 Cal.App.4th 1399, 1406.)

When more than one reasonable inference can be drawn from the undisputed evidence, "'"'the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it . . . .'"'" (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1102.) In that situation, "we must 'accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision . . . .'" (*Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1130, fn. 6; see *Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 892 [where the trial court's determination "turned on the resolution of conflicts in the evidence or on factual

5

inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard"].)

B.  *Powers Under Temporary Conservatorship of the Person*

Silverado argues the trial court erroneously concluded the Holleys did not have the authority to bind Elizabeth to the arbitration agreement.

In *Hutcheson*, *supra*, 17 Cal.App.5th 937, the decedent, Barbara Lovenstein, appointed her niece, plaintiff Robin Hutcheson, as her attorney-in-fact under the Health Care Decisions Law (Prob. Code, § 4671, subd. (a))[2] (the health care POA), in 2006.  This authority gave Hutcheson the power to make health care decisions for her, including the admission to a medical care facility.  (*Hutcheson*, at pp. 941-942.)  In 2010, she also executed a power of attorney (the personal care POA) pursuant to section 4000, et seq., using the statutory form.  She designated her sister, plaintiff Jean Charles, and Hutcheson as her attorneys-in-fact.  The general POA gave Charles and Hutcheson decision-making authority in a number of areas, but did not expressly authorize anyone to make medical and health care decisions for her.  (*Hutcheson*, at p. 942.)

In February 2012, Charles voluntarily admitted Lovenstein to defendant Eskaton FountainWood Lodge's (Eskaton) facility.  (*Hutcheson*, *supra*, 17 Cal.App.5th at p. 942.)  The admission agreement included an arbitration clause.  Lovenstein died in April 2012.  (*Id.* at p. 943.)  After Hutcheson and Charles sued Eskaton, Eskaton petitioned to compel arbitration.  The trial court denied the petition, and in due course the appellate court affirmed.  (*Id.* at pp. 941, 943.)  The appellate court concluded that Lovenstein's admission was a "health care decision" and Charles, who co-held the personal care POA, was not authorized to make such decisions.  (*Id.* at pp. 945-951.)

---

[2] All further undesignated statutory references are to the Probate Code.

6

Similarly, in *Garrison v. Superior Court* (2005) 132 Cal.App.4th 253, 266, the court also found that an agreement to arbitrate was a health care decision. The court concluded that a health care POA was sufficient to establish the validity of an arbitration clause, concluding the arbitration clause was "part of the health care decisionmaking process."

Thus, Silverado argues, the Holleys "acted as [Elizabeth's] conservators; conservators who possessed the authority to make healthcare decisions on [Elizabeth's] behalf. As Conservators, Respondents were 'responsible for the conservatee's care and protection . . . to arrange for the conservatee's health care, meals, clothing, personal care, housekeeping . . . and for making sure the conservatee's healthcare needs are met.'"

Silverado is wrong for several reasons, and those reasons distinguish this case from those cited. We do not disagree with the holdings of *Hutcheson* or *Garrison v. Superior Court*, *supra*, 132 Cal.App.4th 253, that admission to a residential facility is essentially a health care decision. But that is the beginning of the inquiry, not the end, and neither of those cases address conservatorships.

First, the Holleys were, at the time the arbitration agreement was signed, conservators of Elizabeth's person but not her estate. Sections 2350 through 2361 set out the powers and duties of a conservator of the person. A "conservator [of the person] has the care, custody, and control of . . . [the] conservatee." (§ 2351, subd. (a).) As interpreted by the Judicial Council pursuant to section 1834, a conservator of the person is "responsible for the conservatee's care and protection. You must decide, within certain limits, where the conservatee will live; and you must arrange for the conservatee's health care, meals, clothing, personal care, housekeeping, transportation, and recreation." (Judicial Council Forms, form GC-348.)

Assuming that conservators of the person may enter into contracts for these purposes on the conservatee's behalf, the duties of a temporary conservator have more constraints. "A temporary conservator should avoid making long-term decisions or

7

changes that could safely wait until a general conservator is appointed. As temporary conservator, you may not move a conservatee from his or her home, unless there is an emergency, or sell or give away the conservatee's home or any other assets without prior court approval." (Judicial Council Forms, form GC-348.) By purporting to sign the arbitration agreement on Elizabeth's behalf, the Holleys were giving up an important right – the right to use the courts for redress of grievances. As temporary conservators of her person, this was simply beyond their powers without the court's approval.

Second, the power of a conservator of the person to make medical decisions without court approval or the conservatee's consent is limited. Section 2354 states: "If the conservatee has not been adjudicated to lack the capacity to give informed consent for medical treatment, the conservatee may consent to his or her medical treatment. The conservator may also give consent to the medical treatment, but the consent of the conservator is not required if the conservatee has the capacity to give informed consent to the medical treatment, and the consent of the conservator alone is not sufficient under this subdivision if the conservatee objects to the medical treatment." To the extent admission to a residential facility and a concordant arbitration agreement is a "health care decision" as Silverado asserts, they cannot escape the import of this provision. Without Elizabeth's signature, there is no substantial evidence that she consented. Without her consent, the Holleys required a court adjudication that Elizabeth lacked capacity to make such decisions. (§ 2355.) The court's order on this point was not entered until October 30, six days after the arbitration agreement was signed. Accordingly, the Holleys did not have the power to make such decisions for Elizabeth at the time.

## C. The Holleys' Individual Claims

Although it did not raise the issue in its opening brief, Silverado argues in its reply brief that the arbitration agreement is enforceable against the Holleys with respect to their individual claims based on its language: "This agreement shall be binding

8

for any dispute except for disputes pertaining to collections or evictions. This agreement is binding on all parties, including their personal representatives, executors, administrators, successors, guardians, heir, and assigns." Silverado asserts that the Holleys "execut[ed] the Arbitration Agreement as Decedent's conservators but they also are Decedent's heirs, thereby binding them to the Arbitration Agreement."

This presumes, of course, that the arbitration agreement is valid in the first place – which, as we discussed *ante*, it is not. Because they lacked the power as temporary conservators to sign the arbitration agreement on Elizabeth's behalf, this language is irrelevant.

Further, there is no evidence they intended to sign the agreement in their individual capacities. (*Avila v. Southern California Specialty Care, Inc.*, *supra*, 20 Cal.App.5th at pp. 844-845.) The plain language of the document does not contemplate third parties signing on their own behalf. Without evidence of their intent to waive any personal claims, the arbitration agreement is not enforceable against the Holleys individually. Arbitration remains, as we mentioned above, a matter of consent. (See *id.* at pp. 843-844.)

## D. Remaining Arguments

Silverado argues that "[c]ontrary to the trial court's silence, the FAA applies." Ultimately, this is irrelevant to this case, particularly as the trial court did not mention the issue one way or the other. Assuming the FAA does apply, an arbitration clause can nonetheless be found unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) The FAA is simply not relevant when there is no contract in the first place, which is the case here. The Holleys did not have the authority to bind Elizabeth, and therefore, there was no existing arbitration agreement to be governed by the FAA.

9

For the same reason, we need not consider the Hollleys' argument that the motion to compel arbitration was untimely, and therefore, Silverado waived the right to arbitrate. We also need not consider their arguments regarding the unconscionability of the agreement.


## III

## DISPOSITION

The order denying the motion to compel arbitration is affirmed. The Holleys are entitled to their costs on appeal.



MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.

10