Filed 2/8/22  Smith v. Folsom Investors CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RONALD D. SMITH et al., | C092667 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34-2019-00264159-CU-PO-GDS) |
| v. | |
| FOLSOM INVESTORS, L.P. et al., | |
| Defendants and Appellants. | |

Defendants Folsom Investors, L.P. doing business as Empire Ranch Alzheimer's Special Care Center; Folsom Group LLC; Jerry Erwin Associates, Inc., doing business as JEA Senior Living, Inc.; and Brian Pawloski appeal from an order denying their petition to compel arbitration of multiple causes of action in a complaint filed by plaintiffs Ronald Smith, Carrie Zenker, and Amorio Ferreira in their individual capacity and as successors in interest to decedent Carol McCormac.  Defendants claim a power of attorney making Zenker the attorney-in-fact for decedent authorized her to execute an arbitration agreement compelling plaintiffs to arbitrate their claims.  We agree and will reverse the

1

trial court's order denying the motion to compel, with the exception of the trial court's conclusion regarding the absence of a delegation clause in the arbitration agreement, and we will remand the matter to the trial court for further proceedings.

## FACTS AND PROCEEDINGS

*Power of Attorney*

In November 2016, decedent executed a durable power of attorney (DPOA) that appointed Zenker as her attorney-in-fact. The DPOA was effective "immediately" and was not to be affected by any subsequent disability or incapacity. The preliminary section of the DPOA stated in bold, capitalized font: "This document gives your agent the powers to manage, dispose of, sell, and convey your real and personal property, and to use your property as security if your agent borrows money on your behalf." (Boldface and capitalization omitted.) The preliminary section concluded: "You should read this durable power of attorney carefully. When effective, this durable power of attorney will give your agent the right to deal with property that you now have or might acquire in the future. The durable power of attorney is important to you. If you do not understand the durable power of attorney, or any provision of it, then you should obtain the assistance of any attorney or other qualified person." (Boldface and capitalization omitted.)

The DPOA set forth multiple activities in which Zenker was authorized to engage as attorney-in-fact: real estate transactions, tangible personal property transactions, stock and bond transactions, banking and financial transactions, insurance and annuity transactions, estate and trust transactions, legal actions, personal and family care transactions, claiming and collecting government benefits, retirement plan transactions, making gifts from assets, and pet and animal care.

The legal actions section of the DPOA authorized Zenker to "act for [decedent] in all legal matters, . . . sign all documents, submit claims to arbitration or mediation, . . . and exercise all powers with respect to legal actions that [decedent] could if present and under no disability."

2

The personal and family care section of the DPOA authorized Zenker "[t]o do all acts necessary to maintain [decedent's] customary standard of living, and that of any individuals legally entitled to be supported by [decedent], including but not limited to the authority to provide and pay for medical care, shelter, clothing, food, usual vacations, education, transportation, and dues for social organizations and to exercise all powers with respect to personal and family care that [decedent] could if present and under no disability." That section further "specifically" authorized Zenker to "hire and compensate household, nursing, and other employees necessary for [decedent's] well-being and that of any individuals legally entitled to be supported by [decedent], and to enter into contracts and commit [decedent's] resources with respect to the provision of [decedent's] residential care in a convalescent hospital, skilled nursing home, or alternative residential facility."

The DPOA included a section entitled revocation of prior powers of attorney specifying that decedent "revoke[d] all durable powers of attorney naming [decedent] as principal executed prior to this document, specifically excluding any health care powers of attorney and advance health care directives." There is no evidence in the record that decedent revoked this DPOA or that it was otherwise ineffective at any relevant time.

*Arbitration Agreement*

Decedent was admitted as a dementia resident to Empire Ranch Alzheimer's Special Care Center. At the time of decedent's admission to Empire Ranch, Zenker represented that she was authorized to make decisions for decedent. Zenker executed an admission agreement, which was necessary for decedent's admission into Empire Ranch. The admission agreement contained an arbitration agreement, which provided that "any and all claims and disputes arising from or related to this Agreement or to your residency, care or services at the Facility, whether made against us or any other individual or entity, including, without limitation, personal injury or wrongful death claims, shall be resolved by submission to neutral, binding arbitration in accordance with the Federal Arbitration

3

Act . . . . If someone other than the resident signs this arbitration clause, he/she understands and agrees that he/she is agreeing to arbitrate on behalf of the resident and on behalf of him/herself as an individual." In a declaration supporting defendants' subsequent motion to compel arbitration, an Empire Ranch employee declared that he told Zenker signing the arbitration agreement was optional and pointed her to language in the agreement providing her with the power to withdraw her agreement within 30 days of signing. Zenker signed the arbitration agreement as the "responsible party," and there is no evidence that she withdrew from the agreement on decedent's behalf.

*Procedural Background*

After decedent died, plaintiffs--decedent's surviving children and domestic partner--filed a complaint for damages asserting multiple causes of action, including wrongful death, elder abuse, negligence, and fraud and/or misrepresentation.

Defendants filed a petition to compel arbitration. They argued that the DPOA authorized Zenker to execute the arbitration agreement because it conferred general powers of attorney along with specific authority to make health care decisions. They also argued that the trial court lacked jurisdiction to consider any of plaintiffs' potential defenses due to a delegation clause in the arbitration agreement.

Plaintiffs opposed defendants' petition. They argued the arbitration agreement was unenforceable because it was neither signed by decedent nor by decedent's agent pursuant to a valid health care power of attorney (POA), the arbitration agreement did not include a delegation clause divesting the trial court of jurisdiction to consider threshold issues of arbitrability, the individual plaintiffs were not bound to arbitrate their individual wrongful death claims, and the arbitration agreement was unconscionable.

The trial court denied defendants' petition, relying in large part on its reading of this court's opinion in *Hutcheson v. Eskaton FountainWood Lodge* (2017) 17 Cal.App.5th 937 (*Hutcheson*) to hold that defendants had failed to demonstrate that Zenker had the requisite authority to execute the arbitration agreement for decedent due

4

to the lack of a showing that Zenker was authorized to make "health care decisions." Defendants timely appealed. The case was fully briefed on August 23, 2021, and assigned to this panel in September 2021. Following a request for oral argument by both parties, the case was argued and submitted on January 21, 2022.

## DISCUSSION

### I

### *Validity of the Executed Arbitration Agreement*

Defendants contend the trial court erred when it denied their petition to compel arbitration because the DPOA authorized Zenker to execute the arbitration agreement as decedent's agent, requiring plaintiffs to submit their claims to binding arbitration, and *Hutcheson* does not compel a different result. As we will explain, we agree.[1]

A. *Procedure for Compelling Arbitration*

There is a summary procedure to resolve a petition to compel arbitration. (Code Civ. Proc., §§ 1281.2, 1290.2.) "The petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. [Citation.] In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.) Because the trial court's denial of defendants' petition was based on undisputed facts and rested solely on a decision of law, we review the court's order de novo. (*Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1425; *Garrison v. Superior Court* (2005) 132 Cal.App.4th 253, 263.)

---

[1] This does not pertain to plaintiffs' wrongful death claims, as we will discuss *post*.

5

B.  *Legal Background*

The right to arbitration depends on a contract.  Thus, while "California courts 'have consistently found a strong public policy favoring arbitration agreements,' " " ' " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate.' " ' "  (*Goldman v. Sunbridge Healthcare, LLC* (2013) 220 Cal.App.4th 1160, 1169.)  Accordingly, "[i]n determining whether there is a duty to arbitrate, the trial court must, at least to some extent, examine and construe the agreement."  (*Tiri v. Lucky Chances, Inc.* (2014) 226 Cal.App.4th 231, 239.)

Generally, "a person who is not a party to an arbitration agreement is not bound by it," but there is an exception where "a person who is authorized to act as the patient's *agent* can bind the patient to an arbitration agreement."  (*Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 587.)  "[A]n agent is a person to whom the principal has delegated authority."  (*Id.* at p. 592.)  Even when the principal has authorized an agent, the principal is bound only when the agent acts within the scope of the agency.  (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 705-706 [acts of an agent within the scope of their authority bind the principal].)

C.  *Analysis*

The issue before us is whether the DPOA authorized Zenker to execute the arbitration agreement.  Both parties base their argument on whether the DPOA authorized Zenker to make health care decisions for decedent, recognizing that executing an admission agreement with an arbitration clause is a health care decision.  (*Hutcheson, supra,* 17 Cal.App.5th at p. 945.) Defendants contend the DPOA was a hybrid personal care/health care POA that authorized Zenker to make health care decisions for decedent, including executing the admission and arbitration agreements.  Plaintiffs argue that the DPOA was only a general durable POA under the Power of Attorney Law (PAL) (Prob.

Code, § 4000 et seq.) covering financial and property matters, and therefore Zenker did not execute the arbitration agreement pursuant to a valid health care POA .[2]

As did the trial court, both parties focus on *Hutcheson*. In *Hutcheson*, the decedent executed a health care POA authorizing her niece, Hutcheson, to admit the decedent to " 'any hospital, hospice, nursing home, adult home, or other medical care facility,' and the authority to consent to the provision, withholding, or withdrawal of health care." (*Hutcheson*, *supra*, 17 Cal.App.5th at p. 942.) The health care POA was governed by the Health Care Decisions Law (HCDL), which authorizes an attorney-in-fact to make "health care decisions" for the principal (§ 4671), defined in part as " '[s]election and discharge of health care providers and institutions' " (§ 4617, subd. (a)). (*Hutcheson*, at p. 946.)

Several years later, the decedent executed a statutory form personal care POA (§ 4401) under the PAL, which authorized a different person--Charles--to "make decisions regarding the principal's 'personal care' and her 'claims and litigation,' and to enter into contracts to accomplish those purposes." (*Hutcheson*, *supra*, 17 Cal.App.5th at pp. 946, citing §§ 4123, subd. (a), 4450, subd. (b), 4459, subd. (d), 4460, subd. (a); *Hutcheson*, at pp. 942, 945.) The personal care POA empowered Charles "to make decisions relating to [the decedent's] personal care and to maintain [the decedent's] customary standard of living, including providing living quarters by purchase, lease or other contract; providing for normal domestic help; paying for [the decedent's] shelter, clothing, food, and other current living costs; providing transportation; handling mail; arranging recreation and entertainment; and paying for [the decedent's] necessary medical, dental, and surgical care, hospitalization, and custodial care." (*Hutcheson*, at p. 946, citing §§ 4123, subd. (c), 4660, subd. (a)(1), (2), (3).) The personal care POA also

---

[2] Further undesignated statutory references are to the Probate Code.

7

included the authority to submit claims to arbitration and to " '[c]ontract in any manner with any person, on terms agreeable to the [attorney-in-fact], to accomplish a purpose of a transaction.' " (*Hutcheson*, at p. 946, citing §§ 4450, subds. (b), (d).)  The personal care POA expressly did not grant anyone the authority to make " 'medical and other health-care decisions' " for the decedent.  (*Id.* at p. 942.)  Charles admitted the decedent to the defendant healthcare facility, and she signed the admission agreement and an arbitration clause.  (*Ibid.*)

Following the decedent's death, Hutcheson and Charles sued the facility, and the trial court denied the facility's petition to compel arbitration.  The issue on appeal was whether admitting the decedent to the facility and executing the arbitration agreement was a health care decision.  (*Hutcheson*, *supra*, 17 Cal.App.5th at p. 945.)  This court held that residential care facilities providing services such as dementia care are health care providers for purposes of construing the authority conferred by a POA, and the personal care POA did not authorize Charles to make health care decisions for the decedent.  (*Id.* at pp. 945-957.)  We observed that both the PAL and the HCDL define "personal care primarily as providing for the necessities of living at a basic level" (*id.* at p. 947), but we recognized that the PAL defines "personal care" to include "*paying for* 'necessary medical, dental, and surgical care, hospitalization, and custodial care.' " (*Id.* at p. 949, italics added citing § 4460, subd. (a)(3).)  On the other hand, "a decision to place someone in a residential care facility for the elderly, particularly to receive dementia care," is more than just providing for the basic necessities of living that are covered by the PAL.  (*Hutcheson*, at p. 947.)  Accordingly, we concluded that "[c]are and services involving health care cannot be authorized by an attorney in fact acting only under a [statutory form] personal care POA."  (*Id*. at p. 949.)

Defendants contend that *Hutcheson* is distinguishable.  They observe the DPOA was not a statutory form personal care POA and did not expressly state that the document did not authorize anyone to make medical and other health care decisions for the

8

decedent.  Further, they recognize that unlike the personal care POA in *Hutcheson* and like the health care POA in that case, here the DPOA "specifically authorized" the attorney-in-fact "to enter into contracts . . . with respect to the provision of [decedent's] residential care in a convalescent hospital, skilled nursing home, or alternative residential facility."  (See *Hutcheson*, *supra*, 17 Cal.App.5th at p. 942 [health care POA authorized attorney-in-fact to admit the decedent to " 'any hospital, hospice, nursing home, adult home, or other medical care facility' "].)

Plaintiffs respond that although the DPOA here was not a statutory form personal care POA, the reasoning of *Hutcheson* is applicable because the DPOA did not specifically authorize the attorney-in-fact to make health care decisions.  They observe that the DPOA is entitled Durable Power of Attorney, the preliminary section of the DPOA discusses real property but does not mention health care decisions, and the DPOA concerns various areas not including health care.  Additionally, plaintiffs assert that the "personal and family care" section of the DPOA demonstrated that the DPOA was intended to authorize Zenker to commit decedent's monetary resources but not make health care decisions.  Finally, plaintiffs recognize that the DPOA contains a revocation clause stating that the DPOA voids all previous durable powers of attorney "excluding any health care powers of attorney and advance health care directives."  Thus, plaintiffs argue that the DPOA was not intended to authorize Zenker to make health care decisions, and therefore Zenker was not authorized to enter into the arbitration agreement.

After briefing concluded in this case, the First Appellate District, Division Five decided *Gordon v. Atria Management, Co., LLC* (2021) 70 Cal.App.5th 1020 (*Gordon*). In *Gordon*, the court concluded that a DPOA authorized an attorney-in-fact to enter into an arbitration agreement related to a principal's admission to a residential care facility. (*Id.* at p. 1030.)  The DPOA authorized the attorney-in-fact to dispose, sell, convey, and encumber the principal's real and personal property, and to litigate and arbitrate on the principal's behalf, but it advised that it did not authorize anyone to make health care

9

decisions for the principal. The DPOA also included a personal care provision authorizing the attorney-in-fact in part to " 'make arrangements, enter into contracts, and commit the Principal's resources on the Principal's behalf with respect to provision of residential care for the Principal in a convalescent hospital, skilled nursing home, or other alternative residential facility.' " (*Id.* at p. 1023, italics omitted.) The DPOA further authorized the attorney-in-fact to decide whether to move the principal out of her residence after consulting with the principal's agent under an effective advance health care directive, if any; there was no evidence of an effective advance health care directive. (*Ibid.*)

The *Gordon* court concluded that the DPOA authorized the attorney-in-fact to enter into the arbitration agreement, noting that the DPOA authorized entering into contracts with respect to provision of the principal's care in a residential facility, and it authorized submitting claims to arbitration. (*Gordon*, *supra*, 70 Cal.App.5th at pp. 1026-1027.) The court recognized: "The power to submit [the principal's] claims to arbitration reasonably includes the right to decide that future claims will be arbitrated rather than litigated in court." (*Id.* at p. 1027.) The court then rejected the principal's argument and the trial court's conclusion that the attorney-in-fact lacked authority to enter into the arbitration agreement because the decision to agree to arbitration was a healthcare decision pursuant to *Hutcheson*, and the DPOA did not authorize the attorney-in-fact to make health care decisions. (*Gordon*, *supra*, 70 Cal.App.5th at p. 1027.) The court distinguished *Hutcheson* on three bases. (*Id.*, at pp. 1027-1029.) First, the court observed there was no evidence that the principal was admitted to the facility for purposes of obtaining healthcare. (*Id.* at p. 1028.) Second, unlike the personal care POA in *Hutcheson*, the DPOA in *Gordon* expressly authorized the attorney-in-fact to determine whether moving the principal out of her residence was in her best interests, and to enter into contracts and commit the principal's resources with respect to provision of her residential care in a convalescent hospital, skilled nursing home, or other alternative

10

residential facility. (*Id.* at p. 1029.) Third, the arbitration agreement was a standalone document, and therefore the parties did not dispute whether the principal's admission to the facility was authorized. (*Ibid.*)

At oral argument, plaintiffs argued that *Gordon* is distinguishable from this case on the bases that defendants here acknowledge the decision to admit decedent to the facility was a healthcare decision, there is evidence decedent received healthcare at Empire Ranch, and the language in the DPOA in *Gordon* was broader and more specific than the language here because the DPOA in *Gordon* expressly authorized the attorney-in-fact to decide in his discretion to move the decedent out of her residence. However, as we will explain, we conclude that despite these differences, *Gordon* supports the conclusion that the DPOA authorized Zenker to enter into the arbitration agreement because, as in *Gordon*, here the DPOA specifically authorized Zenker to do what she did.

In construing a power of attorney, we must consider the "language of the document itself" (*In re Marriage of Pashley* (1974) 40 Cal.App.3d 1079, 1083 [looking at words themselves, court's construction of power of attorney not supported by record]) and attempt to give meaning to all terms (see *Lyons v. Fire Ins. Exchange* (2008) 161 Cal.App.4th 880, 886-887).

Like the DPOA in *Gordon*, the DPOA here specifically authorized Zenker to enter into the arbitration agreement. The DPOA authorized Zenker to "act for [decedent] in all legal matters, . . . sign all documents, submit claims to arbitration or mediation, . . . and exercise all powers with respect to legal actions that [decedent] could if present and under no disability." We agree with *Gordon* that "[t]he power to submit [decedent's] claims to arbitration reasonably includes the right to decide that future claims will be arbitrated rather than litigated in court." (*Gordon*, *supra*, 70 Cal.App.5th at p. 1027.)

We recognize that the DPOA in *Gordon* also authorized the attorney-in-fact to decide whether to move the decedent out of her home. (*Gordon*, *supra*, 70 Cal.App.5th at pp. 1028-1029.) However, while Zenker was not specifically authorized to decide to

11

move decedent out of her home, that additional authorization is not sufficient to distinguish *Gordon* from the facts here. In both instances, the DPOA expressly authorized the attorney-in-fact to do what the attorney-in-fact did: enter into a contract for the provision of the principal's residential care. Indeed, *Gordon* framed the issue before it as whether the DPOA authorized the attorney-in-fact to execute the arbitration agreement, not whether the DPOA was a health care DPOA. (*Gordon*, at p. 1029, fn. 5.) Thus, according to the court, whether the principal's residential care was for her medical needs or not, the DPOA expressly authorized the attorney-in-fact to enter into the contract providing for her residential care. The same is true here; the DPOA expressly authorized Zenker to enter into contracts for the provision of decedent's residential care.

Further, we agree with defendants that *Hutcheson* is distinguishable. The personal care POA in *Hutcheson* authorized Charles to "pay[ ] for [the decedent's] necessary medical, dental, and surgical care, hospitalization, and custodial care" and expressly excluded the authority to make " 'medical and other health-care decisions' " for the decedent. (*Hutcheson*, *supra*, 17 Cal.App.5th at pp. 946, 942.) But here, the DPOA expressly authorized the attorney-in-fact "to enter into contracts *and* commit [decedent's] resources with respect to the provision of [decedent's] residential care in a convalescent hospital, skilled nursing home, or alternative residential facility." (Italics added.) Thus, the DPOA expressly authorized Zenker to enter into the admissions and arbitration agreements *in addition to* committing decedent's monetary resources to pay for decedent's residential care.

The personal care POA in *Hutcheson* is further distinguishable from our case because a statutory form personal care POA authorizes the attorney-in-fact to pay for the "necessary . . . custodial care" of not only the principal, but also her spouse, children, and other individuals customarily or legally entitled to be supported by her, demonstrating that the personal care POA is intended to authorize allocating resources, not making specific decisions on behalf of individuals who are not principals in the agency

12

relationship. (§ 4460; *Hutcheson*, *supra*, 17 Cal.App.5th at p. 946.) Conversely, here the DPOA authorized Zenker to pay for medical care for decedent and any individuals legally entitled to be supported by her, similar to the statutory form personal care POA, but it separately and specifically authorized Zenker to enter into contracts regarding the provision of only decedent's residential care in a convalescent hospital, skilled nursing home, or alternative residential facility. That distinguishing characteristic supports the conclusion that the DPOA was intended to authorize Zenker to enter into contracts such as the admission and arbitration agreements here.

As we have described, plaintiffs raise multiple arguments as to why the DPOA does not constitute a health care POA, including the title of the document, the preliminary section, other language in the "personal and family care" section of the DPOA, and the revocation clause. But "[t]he question . . . is not whether the DPOA is a health care power of attorney, but whether the DPOA gave [the attorney-in-fact] the authority to sign the Arbitration Agreement." (*Gordon*, *supra*, 70 Cal.App.5th at p. 1029, fn. 5.) Similarly, the issue before us is not whether the DPOA was a health care POA, but rather whether the DPOA authorized Zenker to execute the arbitration agreement. It did. Thus, plaintiffs' attempts to distinguish the DPOA from a health care POA fail to address the provision *expressly authorizing* Zenker to enter into contracts regarding decedent's residence in a skilled nursing home.

Plaintiffs further argue that agencies for health care decisions and financial and property decisions are separate and distinct and that the Probate Code distinguishes powers of attorney for health care (§ 4600 et seq.), granting the agent the authority to make health care decisions, from other powers of attorney. But plaintiffs point to no rule stating that a POA may not authorize an attorney-in-fact to engage in real estate and financial transactions *as well as* specifically stated health care decisions, as occurred here. The statutory schemes for health care POAs and statutory form POAs provide that if there is no specific rule set out, general agency laws apply to powers of attorney.

13

(§§ 4050, subd. (a)(2), 4051 [statutory form powers of attorney]; 4688 [health care powers of attorney].)  Civil Code section 2319, the general agency law, gives an agent power "[t]o do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his [or her] agency."  Signing the arbitration agreement was proper and usual in the ordinary course of admitting decedent to Empire Ranch.

Based on the foregoing, the trial court erred in concluding that Zenker lacked authority to enter into the arbitration agreement.  Because the authority issue was the sole ground for the order denying the petition to compel arbitration, we will reverse the order, and we will remand the matter to the trial court to consider plaintiffs' additional argument that the arbitration agreement was unconscionable.

D. *Plaintiffs' Individual Wrongful Death Claims*

Defendants contend in their opening brief that plaintiffs' individual wrongful death claims are subject to arbitration because Zenker, who signed the arbitration agreement as the "responsible party," and Smith and Ferreira, who did not sign the arbitration agreement, are bound by the agreement's provisions.  However, at oral argument defendants correctly observed the trial court did not reach that issue in its order, and they asserted that they did not brief the issue as a result.[3]  Because the trial court did not rule on this issue and defendants have clarified that they are not raising the issue on appeal, we do not decide whether plaintiffs' individual wrongful death claims are subject to arbitration; the trial court will have the opportunity to address that issue on remand.

---

[3]  Defendants further acknowledged at oral argument that plaintiffs' individual wrongful death claims are not subject to arbitration.

14

## II

### *Delegation Clause*

In denying defendants' petition to compel arbitration, the trial court also rejected the argument that the arbitration agreement included a clause delegating threshold arbitrability questions to the arbitrator. Because we are remanding the matter to the trial court for additional proceedings, we consider defendants' argument that the arbitrator, not the court, must decide issues of arbitrability in the first instance. We agree with the trial court's conclusion that the arbitration agreement does not include a clear and unmistakable delegation clause.

A. *Legal Background*

This court has recently addressed this precise issue, explaining that: "Arbitration agreements are construed to give effect to the intention of the parties. [Citation.] 'If contractual language is clear and explicit, it governs.' " (*Sandoval-Ryan v. Oleander Holdings LLC* (2020) 58 Cal.App.5th 217, 222 (*Sandoval-Ryan*).) Consistent with this principle, parties may also " 'agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes.' " (*Id.* at p. 224, quoting *Henry Schein, Inc. v. Archer and White Sales, Inc.* (2019) ___ U.S. ___ [139 S.Ct. 524, 527] (*Schein*).) Such threshold or "gateway" arbitrability questions arise when parties to an arbitration agreement disagree not only about the merits of the dispute but also about whether the parties have agreed to arbitrate or about whether the arbitration agreement applies to the particular dispute. (*Schein*, at p. ___ [139 S.Ct. at pp. 527, 529].)

"The question of who has the power to decide issues of arbitrability 'turns upon what the parties agreed about *that* matter.' [Citation.] If the parties agreed to submit arbitrability questions to the arbitrator, then the court reviews the arbitrator's decision under the same standard it reviews other decisions by the arbitrator. [Citation.] 'If, on the other hand, the parties did not agree to submit the arbitrability question itself to

arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently. These two answers flow inexorably from the fact that arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration.' " (*Sandoval-Ryan*, *supra*, 58 Cal.App.5th at p. 223.)

"Courts presume that the parties intend *courts*, not arbitrators, to decide threshold issues of arbitrability. [Citation.] Accordingly, ' "[t]here are two prerequisites for a delegation clause to be effective. First, the language of the clause must be clear and unmistakable. [Citation.] Second, the delegation must not be revocable under state contract defenses such as fraud, duress, or unconscionability." [Citation.] The "clear and unmistakable" test reflects a "*heightened* standard of proof" that reverses the typical presumption in favor of the arbitration of disputes. [Citation.]' [Citation.] Where the agreement is silent or ambiguous on the question of who decides threshold arbitrability questions, the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide." (*Sandoval-Ryan*, *supra*, 58 Cal.App.5th at p. 223.)

"[W]hen a party is claiming that an arbitration agreement is unenforceable, it is important to determine whether the party is making a specific challenge to the enforceability of the delegation clause or is simply arguing that the agreement as a whole is unenforceable. If the party's challenge is directed to the agreement as a whole--even if it applies equally to the delegation clause--the delegation clause is severed out and enforced; thus, the arbitrator, not the court, will determine whether the agreement is enforceable. In contrast, if the party is making a specific challenge to the delegation clause, the court must determine whether the delegation clause itself may be enforced (and can only delegate the general issue of enforceability to the arbitrator if it first

16

determines the delegation clause is enforceable).” (*Malone v. Superior Court* (2014) 226 Cal.App.4th 1551, 1559-1560.)

    B. *Analysis*

    Defendants argue clear and unmistakable delegation of threshold arbitrability questions to resolution by the arbitrator, pointing to specific language in the arbitration agreement: “By signing below, you agree, that any and all claims and disputes arising from *or* related to this Agreement or to your residency, care or services at the Facility, whether made against us or any other individual or entity, including, without limitation, personal injury or wrongful death claims, shall be resolved by submission to neutral, binding arbitration in accordance with the Federal Arbitration Act.” (Italics added.) Emphasizing the conjunction “or,” defendants contend that this provision provides that the parties agreed to arbitrate any claim related to the admission agreement *or* any claim related to decedent’s residency, care, or services.

    However, a review of cases in which delegation clauses were included makes it abundantly clear that the provision to which defendants point is not a delegation clause. (See *Sandoval-Ryan*, *supra*, 58 Cal.App.5th at pp. 224-225, citing *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 66 [section in arbitration agreement titled “Arbitration Procedures” provided that “ ‘[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable’ ”]; *Momot v. Mastro* (9th Cir. 2011) 652 F.3d 982, 988 [language that delegated authority to arbitrator to determine “ ‘the validity or application of any of the provisions of’ ” the arbitration clause was a clear and unmistakable agreement to arbitrate the question of arbitrability]; *Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 892 [analyzing delegation clause in arbitration agreement providing in part: the parties “agree to arbitrate all disputes, claims and controversies arising out of or relating to . . . (iv) the

17

interpretation, validity, or enforceability *of this Agreement*, including the determination of the scope or applicability of [the 'Arbitration of Disputes' section]" (italics added) ]; *Malone v. Superior Court*, *supra*, 226 Cal.App.4th at p. 1560 [noting delegation clause providing, " '[t]he arbitrator has exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this binding arbitration agreement' " was clear and unmistakable]; *Tiri v. Lucky Chances, Inc.*, *supra*, 226 Cal.App.4th at p. 237 [arbitration agreement stated in part, " '[t]he Arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part *of this Agreement* is void or voidable' " (italics added)].)

Defendants' reliance on *Schein*, *supra*, ___ U.S. ___ [139 S.Ct. 524] is misplaced. In *Schein*, the high court concluded that a court may not decide threshold issues of arbitrability where an arbitration contract contains a delegation clause even if the argument made against arbitrability is "wholly groundless." (*Id*. at pp. ___, ___ [139 S.Ct. at pp. 527-528].) But *Schein* expressly did not decide whether the contract at issue there contained a delegation clause, and it recognized that "courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.' " (*Id*. at p. ___ [139 S.Ct. at p. 531].) Here, as we have discussed, the arbitration agreement does not contain a delegation clause. *Schein* is inapposite.

Absent clear and unmistakable language delegating threshold arbitrability issues to the arbitrator, the trial court correctly concluded that the arbitration agreement did not include a delegation clause. Thus, on remand the trial court shall decide all threshold issues of arbitrability.

18

## DISPOSITION

The trial court's order denying the motion to compel arbitration is reversed except as to its correct conclusion that the arbitration agreement did not include a delegation clause. The matter is remanded for further proceedings consistent with this opinion. The parties shall pay their own costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

                                         /s/
                                    Duarte, Acting P. J.

We concur:

    /s/
Renner, J.

    /s/
Krause, J.